Opinion

per curiam:

A commissioner of this court, after a full hearing of the evidence, made findings of fact to which neither the plaintiff nor the Government has taken exception. The court adopts and approves those findings. They show *555 that tbe plaintiff entered into a contract with, the Government to perform certain construction work for a fixed sum of money. The contract contained no escalator clause or other language entitling the contractor to a larger compensation if its costs should be increased by increases in wage rates or material prices. The contract was negotiated at a time when hostilities in Europe had already ended and it was easily forseeable that hostilities in the Pacific would soon be over.
When Japan surrendered, the Government eased controls of wages and materials, and wages and prices went up. The plaintiff, largely through a subcontractor, performed its contract well, and it and the subcontractor lost money.
The plaintiff recognizes that it has no claim which could be maintained in a court proceeding at law or in equity. It claims, however, that, in the circumstances, the Government is bound in morals and honor to compensate the plaintiff for its losses. The court supposes that a considerable number of contractors with the Government, as well as a considerable number of contractors in private enterprises, suffered losses because of the removal of wage and price controls during the performance of their contracts. If this plaintiff is to be regarded as morally entitled to compensation for its losses, other contractors similarly situated would be. similarly entitled. The question thus becomes an important question of fiscal policy, which must be answered by the Congress. We think that, in these circumstances, it might be confusing rather than helpful for us to make a recommendation to the Congress. We therefore limit our report to the facts as we have found them.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Roald A. Hogenson, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff, an Ohio corporation with its principal office at White Plains, New York, is the claimant named in Senate Resolution 240, 83rd Congress, 2nd Session, passed May 4, 1954, which provides as follows:
Resolved\ That the bill (S. 1162) entitled; “A bill for the relief of S. A. Healy Company,” now pending *556 in the Senate, together with all accompanying papers, is hereby referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same, in accordance with the provisions of said sections, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shan be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
S. 1762, 83rd Congress, proposed that the Secretary of the Treasury be authorized to pay to plaintiff in full payment of all claims against the United States for losses plaintiff sustained in connection with contracts numbered NOy-12759 and NOy-12806, the sum of $547,803.87.
The petition in this case was filed on August 3, 1954.
2. On November 29, 1944, President Franklin D. Roosevelt, having been informed as to an impending emergency in the water supply of San Diego County, California, decided that the situation was of emergency importance to the Federal Government due to the “very large naval, other military, war industrial, and war-housing installations in the area,” and directed the construction of an aqueduct by the Bureau of Yards and Docks, Navy Department, to meet this emergency.
3. Construction contracts were awarded to various contractors on the basis of competitive bids submitted on various sections of the project pursuant to invitations to bid issued to a select group of bidders. Plaintiff heard of the proposed project and sent one of its engineers to San Diego where he requested the Navy to include plaintiff on the list of bidders. Plaintiff was placed on the list, and thereafter received invitations to bid on each of the sections of the aqueduct. Two of the several sections or parts of the project áre involved in this case.
4. The invitation to bid on specifications for contract NOy-12759, hereinafter called the pipeline contract, was issued on .June 26, 1945, with the requirement that the bid be submitted on or before August 1, 1945. The pipeline *557 contract envisaged the construction of a concrete pipeline and structures over a distance of about 24.5 miles in the vicinity of Escondido, San Diego County, California. The specifications required the furnishing of all materials, equipment and labor for excavations, construction and placing of concrete pipe, concrete vents, manholes, blowoff and riser structures, including appurtenant parts and accessories, and various crossings and fencing.
5. The invitation to bid on specifications for contract NOy-12806, hereinafter referred to as the tunnel contract, was issued on or about July 10, 1945, with the requirement that the bid be submitted on or before August 8, 1945. The tunnel contract envisaged the construction of the Rainbow, Lilac, Red Mountain and Oat Hills Tunnels, totaling about 11,750 linear feet in length, in San Diego County, California. The specifications required the furnishing of all materials for the construction of the four tunnels and the use of structural and reinforcing steel, timber, concrete aggregates, Portland cement and sewer pipe drains.
6. Upon receipt of the aforesaid invitations to bid, plaintiff sent three of its engineers to California to investigate the subject matter of the proposals and to advise plaintiff with respect to submission of bids. Their investigation consisted of an examination of the detailed specifications which had been prepared and filed by the Bureau of Yards and Docks, including the requirements with respect to materials and payment of minimum wage rates set forth in the specifications, physical examination of the site of the proposed pipeline and tunnels, and a telephone conversation with the secretary of the Secretary of the San Diego Building Trades Council to verify that there had been no error in printing of the minimum wages set forth in the specifications. Plaintiff made general inquiry and was advised, as the fact was, that the prevailing wages were those set forth in the specifications. Plaintiff received no information as to whether or not there was any contemplated change in wage rates.
7. The specifications prepared by the Bureau of Yards and Docks set forth the minimum rates which were to be paid to workers engaged in the construction performed under the contracts.
*558 8. At the time plaintiff prepared and submitted its bids, wage rates and material prices were controlled pursuant to Executive Order 9250, National War Labor Board General Order No. 18, and Maximum Price Regulations of the Office of Price Administration. These controls provided that an employer could not increase the wages of his employees without authorization from the National War Labor Board or the War Manpower Commission, and that materials might not be sold at prices higher than those contained in Maximum Price Regulations.
9. In the preparation and submission of its bids, plaintiff understood and relied upon its understanding that wage rates and material prices were frozen, and that wage and price levels were stabilized in the area during World War II, and could not be changed without approval of the proper agency of the defendant.
10. Six other companies bid on the Navy specifications for the pipeline contract and five other companies bid on the Navy specifications for the tunnel contract. The plaintiff’s bids were accepted by the Navy and the contracts, numbered NOy-12759 and NOy-12806, were executed on August 14 and August 22,1945, respectively.
At and prior to the time of the execution of these com tracts and during the entire course of World War II, it was the stated policy of the Federal Government to stabilize wages and prices.
11. On October 12, 1945, before any substantial part of the project had been constructed, the defendant’s Wage Adjustment Board approved substantial wage increases for 102 construction-worker classifications in the San Diego area covering the twelve Southern California counties. It was provided that, the new wage scales were to apply on “non-Federal building, heavy and highway construction work” effective as follows:
These wage scales are authorized to be effective immediately upon projects contracted for after the date of this decision, and 90 days from said date upon work then in progress, or for which a contractor has become obligated to perform by valid written contract or bona fide irrevocable commitment. Notwithstanding the foregoing provisions, contractors who wish to do so are au- *559 thorizecl to pay tbe foregoing wage scales upon non-Federal work in progress on the date of this decision effective immediately.
It was the decision of the Board to recommend recognition of the new wage rates in the next wage determination issued by the Secretary of Labor pursuant to the amended Davis-Bacon Act, with respect to Federal construction in the areas involved.
On January-30,1946, the Wage Adjustment Board reconsidered its decision of October 12, 1945, at the request for clarification by certain unnamed contractors, and decided further as follows:
The Board on this date found that the rates authorized in this case on October 12, 1945, are approvable under the regulations of the Director of Economic Stabilization, and, therefore, authorized the rates to become effective on Federal and non-Federal building, heavy and highway construction work in the twelve Southern California counties, effective as provided for non-Federal construction in the decision of October 12,1945.
12. The Board’s decision of October 12, 1945, approved an application made jointly by the Southern California Chapter of the Associated General Contractors and the Building Trades Unions in the various Southern California counties, to obtain authorization to pay increased wage rates embodied in collective agreements between them.
Plaintiff was not a member of the Southern California Chapter or any other chapter of the Associated General Contractors, and was unaware of any application for wage increases or the Board’s decision until October 26,1945, when it was notified by the Navy Department.
13. In August 1945, James S. Barrett proposed to plaintiff that he be permitted to undertake as a subcontractor some of the work under plaintiff’s contracts.
Mr. Barrett had been engaged in the heavy construction business, including pipeline and tunnel construction, for over twenty years. In October 1945, after negotiations for such subcontract had progressed, Mr. Barrett commenced moving his construction equipment to the site of the project, and continued his negotiations for a subcontract until an oral agreement was reached some time in November that *560 Mr. Barrett would perform the entire job for plaintiff. A formal subcontract agreement covering all remaining' work which plaintiff had agreed to perform, was executed by plaintiff and Mr. Barrett January 1,1946.
Plaintiff loaned sums of money aggregating about $350,000 to Mr. Barrett, which sums were used in the performance of the contracts. This indebtedness remains unpaid to plaintiff as Mr. Barrett’s losses on the subcontract performance approximated $600,000. Although plaintiff’s petition alleges that plaintiff has taken an assignment of Mr. Barrett’s claim, if any, against the defendant, plaintiff has agreed with Mr. Barrett that any recovery in this case will be paid by plaintiff to Mr. Barrett.
14. Mr. Barrett in 1945 was a member of Associated General Contractors. He was aware that agreements between union labor and employers in the San Diego area were usually made between the San Diego Building Trades Council and Associated General Contractors. When he commenced to perform the contract work in October 1945, he did not know that an application had been made for wage increases, but did learn of the application early in that month, and knew before he executed the subcontract with plaintiff that wages had been increased. The allowance of wage increases did not cause concern to Mr. Barrett because he assumed and took for granted that change orders would be issued by the Navy Department to compensate him for any increase in wage rates.
15. Both the pipeline and the tunnel contract had provisions concerning changes and changed conditions, providing in pertinent part as follows:
Article 4. — Performance of the Work. * * * (b) Changed Conditions— * * * Should the Contractor encounter, or the Government discover, during the progress of the work, subsurface or latent conditions at the site materially differing from those shown on the drawings or indicated in the specifications, or unknown conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as being inherent in work of the character provided for in the plans and specifications, the Contracting Officer shall be notified before the existing conditions are disturbed. The Contracting Officer shall thereupon *561 promptly investigate the conditions, and if he finds that they do so materially differ, the contract shall be modified by the Contracting Officer to provide for any increase or decrease in cost and difference in time resulting from such conditions. Such modification by the Contracting Officer shall be final, subject only to appeal under the provisions of Article Iff hereof.
Article 10. — Changes, (a) The Contracting Officer may at any time or times, by a written order, and without notice to the sureties, make changes in the drawings or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the cost of doing the work under this contract, or in the time required for its performance, an equitable adjustment in the pertinent contract terms shall be made as hereinafter provided and the contract shall be modified in writing accordingly. * * *
16. Plaintiff’s contracts both contained clauses providing for payment by plaintiff to defendant of liquidated damages, $600 per calendar day on the tunnel contract and $1,500 per calendar day on the pipeline contract, for delays beyond the specified period of performance, with the usual qualification that plaintiff would not be charged with delays caused by labor strikes, acts of the Government, or other matters beyond the control and without the fault or negligence of the contractor.
There is no evidence that there was any labor strike of the employees of plaintiff or its subcontractor, or inexcusable delays in the performance of the contracts, and there was no assessment of liquidated damages. The performance of the contracts was excusably delayed by inability to obtain materials and supplies from strike-bound manufacturing plants.
17. Having received notice on October 26, 1945, from the Navy Department of the decision of the Wage Adjustment Board, plaintiff a few days later contacted the Navy’s officer in charge of construction, advised him that plaintiff’s bids had been based on the wage rates set forth in the specifications, and asked what adjustment the Navy Department would make. The officer’s reply was that any decision would have to be made at Washington, D. C.
18. By letter dated December 14, 1945, plaintiff sent a written protest to the Navy’s contracting officer, Eleventh *562 Naval District, San Diego, California, covering both, of its contracts, advising that plaintiff had no knowledge of the proposed increase in.rates of wages, that it had not been given any opportunity to protest or be heard in opposition to the Wage Adjustment Board’s authorization of the increase, and that in fact the Navy Department did not notify plaintiff of the Board’s decision until October 26, 1945.
19. By letters dated December 20, 1945, the Navy’s officer in charge of construction advised plaintiff with respect to increased labor costs on each of its contracts that he had received the following advice from the Bureau of Yards and Docks:
The decision of the Wage Adjustment Board of 12 October 1945 is not a mandatory decision, but is an authorization to contractors in Southern California to pay the increased wage rates, which wage rates were embodied in collective agreements between the Southern California Chapter of the Associated General Contractors and the Building Trades unions in the various Southern California counties. The subject contractors are parties to this agreement as they are members of this chapter of the Associated General Contractors and in addition, members of other chapters of the Associated General Contractors. Therefore, the wage increases were purely voluntary on the part of the Associated General Contractors, its members; and the Building Trades unions, and the Bureau will not consider any increase in price of the subject contract to finance the increase in wages.
The contractors call attention to certain principles resulting from the Emergency Price Control Act of 1942 and the War Powers Acts and certain Executive Orders, placing a ceiling upon wages. The attention of the Officer-in-Charge of Construction is called to provisions of the contract which specify a minimum wage schedule, and the long-standing practice in government construction, with which the subject contractors are duly familiar, that increases in wages above the minimum schedules on lump-sum or unit price contracts, are not financed by the government. The ceiling upon wages was a ceiling existing only until the contractors secured authority to have the ceiling raised. In no instance does the Bureau as contracting agent require that the ceiling be raised on lump-sum contracts.
The attention of the contractor should be called to Paragraph 3 of the decision of the Wage Adjustment *563 Board, forwarded to tbe Officer-in-Charge of Construction by letter dated 4 December 1945 which authorizes the rates on projects contracted for after 12 October and does not authorize the rates on going projects until 90 days thereafter, namely, 12 January 1946, unless the contractor wishes to pay the rates in advance thereof. In addition, Paragraph 2 of this decision specifically states that the rates apply on non-Federal construction and do not apply to Federal construction at all. It is the contractor’s responsibility to request authority to pay the rates on projects financed by the Federal Government, from the Wage Adjustment Board on lump-sum contracts and the contracting agency on cost-plus-fixed-fee contracts.
20. On October 6, 1945, a few days prior to the decision of the Wage Adjustment Board, the Secretary of the Navy decided to order the cancellation of the emergency aqueduct project. This decision was made as part of a drastic curtailment of the Navy’s public works construction program following the cessation of hostilities on August 14, 1945. Before this decision was made on October 6,1945, the Navy had advised the plaintiff that it was considering cancellation of the plaintiff’s contracts and inquired as to an estimate of the plaintiff’s costs if the Navy cancelled. The plaintiff submitted an estimate of these costs to the Navy on October 3,1945.
However, the city of San Diego protested the Navy’s proposed discontinuance of the aqueduct project and sent representatives to Washington, D. C., to persuade the Government that the project should not be abandoned by the Government. On October 17,1945, the Navy and the city of San Diego agreed upon a contract under which the Navy would continue with the construction work and the city of San Diego, upon its completion, would lease it for a period not exceeding 32 years, at an annual rental of $500,000, “until such time as the city has paid to the Government in rentals, the full amount of the true cost to the Government * * * of the aqueduct.” It was agreed that the city of San Diego could obtain title to the aqueduct earlier by payment of the full true cost to the Government.
21. In 1947 the contract between the Navy and the city of San Diego was the subject of an investigation by the Sen *564 ate Committee on Expenditures in the Executive Departments which, after extensive hearings reported to Congress that there was serious question as to the authority of the Navy Department to proceed with the construction of the aqueduct as a peacetime project or to enter into the contract with the city of San Diego without obtaining approval from Congress, but recommended retroactive authorization.
Thereafter Public Law 482, 80th Congress, 2nd Session, approved April 15, 1948, retroactively authorized construction by the Navy Department of the aqueduct and ratified the execution of the contract with the city of San Diego.
22. After the Navy Department had decided in mid-October 1945 to proceed with the construction of the aqueduct and after the Navy notification to plaintiff on October 26, 1945, of the decision of the Wage Adjustment Board, plaintiff endeavored to employ workmen. Labor refused to work at the rates set forth in the specifications annexed to plaintiff’s contracts. Plaintiff was required to pay the increased wage rates to obtain workmen. As of August 12, 1946, further wage increases on Federal and non-Federal building, heavy and highway construction were approved by the Wage Adjustment Board on joint application of the Building Trades Council and the Associated General Contractors. As of May 1, 1947, still further wage increases covering the classifications of labor required for plaintiff’s performance resulted from the agreement of the Associated General Contractors and the American Federation of Labor to continue their Southern California Master Labor Agreement.
Plaintiff and its subcontractor were threatened with strikes and withdrawal of their workmen, and were forced to pay the successive wage increases in order to continue the performance of the contracts.
23. Because of threats of strikes of the unions involved, and without any intervention on the part of the defendant, Mr. Barrett was also compelled to make changes in labor classifications, particularly with respect to electricians, plumbers, and power equipment operators, resulting in the employment of additional workmen to perform the tunnel contract. Had the unions not demanded such reclassifica- *565 tions, tibie additional employment would have been unnecessary to complete the contract.
24. The plaintiff and its subcontractor in the performance of their contracts laid a concrete pipeline about twenty-five miles in length and constructed the Rainbow, Lilac, Red Mountain, and Oat Hills tunnels. This work was accomplished in inaccessible and difficult terrain and completed in August and September 1947. Their performance was to the entire satisfaction of the Navy Department.
25. The amounts paid by the plaintiff and its subcontractor due to increased wage rates, changes in labor classifications and material price increases were as follows:
WAGE INCREASES
Contract NOy-12759 (pipeline)-$96,888.91
Contract NOy-12806 (tunnel)_ 93,342.29
190,231.20
CHANGES IN LABOR CLASSIFICATION
Contract NOy-12806 (tunnel)_$72,433.45
MATERIAL PRICE INCREASES
Contract NOy-12759 (pipeline)-$26,270.54
Contract NOy-12806 (tunnel)_ 56,245.60
82,516.14
These increased costs include payroll taxes and payroll insurance in the amount of approximately 12 percent of the increased labor costs, sales taxes in the amount of 2.5 percent of the increased material costs, and a proportionate amount of bond premiums.
26.The overhead expense of plaintiff and its subcontractor on the tunnel contract was 7.52 percent of performance costs, and on the pipeline contract 3.88 percent of performance costs, both exclusive of payroll taxes, payroll insurance, sales taxes and bond premiums. By excluding the same items from the increased costs set forth in finding 25, the net increased costs on the tunnel contract amounted to $202,147.75, on which overhead at 7.52 percent would amount to $15,201.51, and the net increased costs on the pipeline contract amounted to $111,730.25, on which overhead at 3.88 *566 percent would amount to $4,335.13, or a total allocation of overhead to increased costs in the sum of $19,536.64.
There is no evidence in this record as to the extent, if any, to which the overhead costs of plaintiff or its subcontractor were increased as a result of increases in wages, changes in labor classification, or increases in material prices.
27. Plaintiff and its subcontractor claim to be entitled to a profit allowance at the rate of six percent of its increased costs. Those total increased costs being $345,180.79, the profit allowance on that basis would amount to $20,710.85.
Article 10 of both contracts, which concerns changes in the drawings or specifications, ordered by the contracting officer, provided for addition of a profit allowance of six percent to the costs of performing changes as compensation to the contractor. There is no other basis in the evidence for determination of the amount of profit allowance.
28. The original construction cost for the entire aqueduct project was conservatively estimated at $17,500,000, but because of favorable low bids the cost of the entire project was considerably reduced so that the actual true cost approximated $14,500,000.