Littleton, Judge,
delivered the opinion of the court:
Plaintiff’s claim was referred to the court pursuant to Senate Resolution No. 142, 84th Cong., 1st Sess., passed July 30, 1955, providing as follows:
Resolved, That the bill (S. 641) entitled “A bill for the relief of Joseph H. Lym, doing business as Lym Engineering Company”, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal, or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
The relief sought by plaintiff is the recovery of certain losses incurred in the performance of a contract between plaintiff and the Bureau of Reclamation, Department of the Interior. The contract work was commenced on or about April 23, 1945 and was scheduled for completion on August 1, 1945. It was not completed until February 6, 1946. The claimed losses were incurred-between August 14, 1945, and February 6,1946.
During the course of World War II the plaintiff performed .various contracts for the United States. On Feb *145 ruary 12,1945, while plaintiff was completing war contracts for the United States in Utah and Wyoming, he submitted his bid in the amount of $130,041.36 to the Bureau of Beclamation for the construction of an irrigation project near Tucumcari, New Mexico. The purpose of the project was to irrigate certain arid lands in New Mexico for war food production. There was a long irrigation canal on the north and west side of Tucumcari and the work involved the building of laterals and sublaterals from the canal and running down through the area to be irrigated. The project required the building of headgates, siphons, flumes and outlets over an area of approximately 24 square miles. On the usual building construction project, one supervisor can direct the work of 30 or 40 men. On the irrigation project in suit, however, it was necessary to use many small groups of laborers over a very wide area with a supervisor in charge of each small group. Plaintiff knew when he bid on the contract that he would need to employ a large force of skilled supervisory personnel if the project was to be completed August 1, 1945, in the 100 days allotted for completion and at the price bid. When plaintiff submitted his bid on February 12,1945, he had then in his employ three permanent supervisors consisting of one superintendent and two supervisory foremen. Plaintiff also had in his employ some 60 skilled workmen capable of supervising the small groups of unskilled laborers which would be required on the new project. It was plaintiff’s intention to take his supervisory force to the new project in New Mexico and to recruit from the Tucumcari area the required number of unskilled employees.
On about February 15, 1945, three days after submitting his bid on the irrigation project, plaintiff completed the other Government war contracts he then had in progress. Under the then existing rules of the War Manpower Commission, an employer was required to release his skilled labor force upon the completion of a contract, but he had the right to reemploy such skilled employees at any time within thirty days. At the expiration of thirty days, the employer had no right to rehire such skilled laborers.[1] The thirty-day period *146 within which the plaintiff could rehire his skilled employees expired on March 15,1945, by which time the Tucumcari irrigation project contract had not yet been awarded to plaintiff. Knowing that his right to reemploy his skilled labor force would expire on March 15,1945, plaintiff had made frequent inquiry of the Bureau of Reclamation as to the status of his bid. Under the terms of the invitation to bid, the Bureau had 60 days,within which to accept or reject the bid. It appears likely that the Bureau would have accepted plaintiff’s bid within the 30 days specified by the War Manpower regulations if it had not been for the circumstance that the Bureau required War Production Board approval for the project as an integral part of the War Food Program. The Tucumcari irrigation project had been first authorized in 1938. It was halted in 1942 by the War Production Board, and in April 1944, it was approved by WPB for continuation under the War Food Program until April 1,1945. On March 13, 1945, the War Production Board extended the terminal date of approval from April 1, 1945, to March 31,1946, for the Tucumcari Project, and on March 19,1945, the irrigation contract was awarded to the plaintiff. By this time, however, plaintiff had lost his right to reemploy the 60 skilled employees, and when plaintiff received his notice to proceed on April 23,1945, he had available only his three permanent supervisors to aid him in recruiting and supervising the new labor force needed for the performance of the irrigation project in New Mexico.
The contract provided that performance thereunder must be completed in 100 calendar days, making the completion date August 1, 1945. If plaintiff had been able to use the 60 skilled employees who had been in his employ just prior to the award of this contract, he could have completed the contract by August 1, 1945, at a cost of approximately 10 percent below the contract figure of $130,041.63. Because of plaintiff’s inability to use his skilled supervisory force, and because of the poor quality of labor available in the Tucumcari area[2] and the high rate of turnover, plaintiff *147 required 289 calendar days to complete performance and plaintiff’s contract costs far exceeded those which would otherwise have been incurred. At the completion of the contract on February 6,1946, the Government assessed liquidated damages against plaintiff for the 189 days of delay in the sum of $9,450.
Shortly after commencing work on the project in April 1945, plaintiff realized that because of the poor quality of labor and the lack of a skilled supervisory force, his costs were running far in excess of estimates. Accordingly, plaintiff applied to the Bureau of [Reclamation for an upward adjustment of his contract price. Under the provisions of the First War Powers Act, the Bureau had authority to make such an upward adjustment in the contract price without consideration if it determined that the conditions specified in that Act warranted it. Plaintiff’s application for First War Powers Act relief was not processed until after hostilities were terminated on August 14,1945, and his application for relief was finally denied on the ground that it could no longer be said that such relief would aid the Government in the prosecution of the war.
Upon completion of the contract, final payment was made. The plaintiff executed a release which was subject to plaintiff’s claim to recover the $9,450 withheld for liquidated damages and also $189,484.95 for increased costs incurred by plaintiff under the contract without fault or negligence on plaintiff’s part. The Bureau of Reclamation determined that part of the delay was due to an unforeseeable condition under Article 9 of the contract,[3] and remitted liquidated damages to the extent of $4,150, but it never paid this amount to the plaintiff because the voucher covering that amount was not executed by plaintiff. The balance of plaintiff’s claim to the Bureau was rejected on the ground that it involved a claim for unliquidated damages which the Bureau was not authorized to award administratively.
Plaintiff made a timely application to the Bureau of Reclamation for relief from losses incurred under the contract *148 pursuant to the provisions of the Act of August 7, 1946, 41 U. S. C., 1946 Ed., Sec. 106, Note, known as the Lucas Act, which provided that Government departments might consider, adjust and settle equitable claims of contractors for losses incurred between September 16, 1940, and August 14, 1945, on war contracts for work, supplies or services furnished between those dates, if the losses had not been the result of fault or negligence on the part of the contractor.
On September 3,1948, the Department of the Interior determined that plaintiff’s losses were incurred without fault or negligence on the part of plaintiff, and plaintiff was reimbursed for those losses on the contract in suit which were incurred from the commencement of the contract in April 1945 up to and including August 14,1945. The claim which is covered in the present reference is for losses incurred on the same contract from August 14, 1945, to the date of completion of the contract on February 6, 1946. Plaintiff concedes that the claim for losses incurred subsequent to August 14, 1945, is not covered by the Lucas Act. T. Calvin Owens v. United States, 123 C. Cls. 1, 9.
The commissioner has found that plaintiff’s net losses incurred on the contract after August 14, 1945, were $111,-080.60, and plaintiff has not excepted to this finding. Defendant contends that the commissioner erred in allowing $9,823.39 as equipment ownership expense which defendant says should have been $4,870.66. The sum of $4,-952.73 which defendant urges should be disallowed in this item is said by defendant to represent overhead costs attributable to the equipment, and thus it amounts to a duplication because there is already included in the tabulation of plaintiff’s costs an overall allowance of 10 percent for overhead (job supervision and general expense). We think that the commissioner has correctly found the amount allowable as equipment ownership expense to be $9,823.39. Included in that figure is the sum of $2,160.39 representing interest, taxes, storage and insurance on the equipment (not $4,952.73 as urged by defendant). Those charges are generally considered to be direct costs of performance and were properly included in the tabulation appearing in finding 16.
*149 Defendant also excepts to the commissioner’s finding 15 that plaintiff’s contract earnings were $79,482.26, urging that the earnings were actually $81,551.37. The record in this case persuades us that the commissioner’s statement of plaintiff’s earnings after August 14, 1945, are correctly reported (finding 15) and defendant’s exception is without merit. The computation of plaintiff’s losses for the purpose of the Lucas Act claim settlement, has no application here.
The parties have conceded, and we agree, that plaintiff does not have a legal claim for the recovery of the losses found by the commissioner to have been incurred subsequent to August 14,1945. Plaintiff urges, on the matter of whether or not his claim is equitable in nature, that the holding of this court in Burkhardt v. United States, 113 C. Cls. 658, is applicable to the facts herein. Defendant takes the position that the facts of plaintiff’s case bring it more nearly within the teaching of S. A. Healy Company v. United States, 140 C. Cls. 554. Actually, plaintiff’s case differs materially from both cases relied on and it may be useful to discuss those distinctions.
In the Burkhardt case, supra, it had been determined by the Supreme Court (324 U. S. 499), reversing the Court of Claims (101 C. Cls. 222), that plaintiff was not entitled to an award of just compensation for the taking of part of plaintiff’s hydroelectric power occasioned by the Government’s raising of the water level of Lake St. Croix, because plaintiff’s lands at the point in question were not fast lands but were rather at a level which subjected them to the Government’s dominant servitude of navigation. Subsequently, the claim was submitted to the court by a Senate Resolution requesting the court to report to Congress whether plaintiff’s demand was a legal or equitable claim or merely a demand for a gratuity. The court held that while the plaintiffs did not have a right either in law or in equity to recover compensation from the Government, plaintiffs did have an “equitable” claim against the Government in a broad non-juridical sense, i. e., in a broad moral sense based upon general equitable considerations. The court conceded that such a claim was one which could be satisfied only by Congress *150 and the court found and reported to Congress the amount which would fairly and justly compensate plaintiffs if Congress was disposed to do so.
In the S. A. Healy Company case, supra, the plaintiff had received from the Government two invitations to bid on Government contracts. One invitation required that the bid be submitted on or before August 1, 1945, and the other specified that the bid be submitted on or before August 8, 1945. Plaintiff bid on both contracts, received the awards, and the contracts were executed on August 14, 1945, and on August 22, 1945, respectively. As pointed out by the court, at the time of the bids, the war in Europe was over (Y-E Day was May 7, 1945), and it was apparent that the war in the Pacific was about to terminate. By the time both contracts were awarded, the war had ended. Immediately following the end of the war on August 14, 1945, the Government began relaxing its policy of stabilizing wages and prices, and on October 12, 1945, the Wage Adjustment Board authorized higher rates for wage payment on both Federal and non-Federal construction work in California. Plaintiff’s contract contained no escalator clause and in order to complete the work on time, plaintiff was forced to pay more than it had estimated for wages and materials which were no longer subject to strict control. The court pointed out that the “contract was negotiated at a time when hostilities in Europe had already ended [subsequent to May 7, 1945] and it was easily foreseeable that hostilities in the Pacific would soon be over.” The court stated that undoubtedly a considerable number of contractors, government and private, suffered losses because of the removal of wage and price controls immediately after Y-J Day. The court, therefore, concluded:
If this plaintiff is to be regarded as morally entitled to compensation for its losses, other contractors similarly situated would be similarly entitled. The question thus become an important question of fiscal policy, which must be answered by the Congress. We think that, in these circumstances, it might be confusing rather than helpful for us to make a recommendation to Congress. We therefore limit our report to the facts as we have found them. [Italics supplied.]
*151 Defendant contends that the rationale of the Hedly case is directly applicable to the circumstances of plaintiff’s case. Plaintiff disagrees, and we are of the opinion that there are certainly important distinctions between the two cases. While the plaintiff in the Heady case submitted its bids when V-J day was a “foreseeable” certainty, plaintiff herein submitted his bid on February 12, 1945, before the war in Europe had ended (on May 7, 1945), and little was foreseeable about the outcome of the war in the Pacific. Plaintiff herein commenced work or or about April 23, 1945, whereas plaintiff in the Hedly case did not receive its award until V-J day on August 14,1945 on one contract, and even later on the other. Plaintiff’s losses herein were occasioned by the operation of the regulations of the War Manpower Commission in February and March of 1945, and, but for the restrictions on his right to reemploy his skilled supervisory force, plaintiff would have completed the contract in suit two weeks before V-J day, i. e., on August 1, 1945. It was not, as in the Heady case, the operation of the Government’s policy of postwar relaxation of wartime wage and price controls which caused this plaintiff’s 'losses, but rather the operation of wartime manpower restrictions operating several months prior to the end of the war. If plaintiff had been able to complete the contract on the specified date of August 1, 1945, or at least prior to August 14, 1945, he would have recovered all of his losses under the terms of the Lucas Act, since it was found that he was an essential war contractor and was in no way at fault or negligent in the performance of his contract. Neither of Healy’s contracts were awarded during the Lucas Act period.
We are of the opinion that plaintiff’s situation in no way resembles the situation of plaintiff in the Heady case, and he cannot be said to be “similarly situated.” We are also of the opinion that under the circumstances of his case, there is much to recommend the relief sought from the point of view of justice and equity in the non-juridical sense referred to in the Burkhardt case. Whether or not plaintiff is to be compensated by the Congress for the losses incurred in the performance of that portion of the contract which extended beyond August 14, 1945, Congress alone must determine. *152 If Congress is disposed to compensate plaintiff for such losses, a fair and equitable settlement would be in the amount of $111,080.60. Of that amount $9,450 representing liquidated damages for the 189 days of delay, was clearly a harsh and unjust penalty. Gay Street Corporation v. United States, 130 C. Cls. 341, 350.
CONCLUSION
Plaintiff does not have a legal or strictly equitable claim against the Government for the losses sustained subsequent to August 14, 1945, but we think that plaintiff is morally entitled, in the broad sense of equity, to receive $111,080.60 representing such losses. We therefore recommend that amount to the Congress if Congress decides that plaintiff should be compensated for his losses. See conclusion and recommendation of this court to Congress in the case of Cong. No. 3-52, Gay Street Corporation of Baltimore, Maryland v. United States, 130 C. Cls. 341 at 350.
This opinion with the findings of fact which follow will be certified to the Congress pursuant to Senate Eesolution 142, 84th Congress, First Session.
Reed, Justice (Ret.), sitting by designation; Madden, Judge; Whitaker, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Eoald A. Hogenson, and the briefs and arguments of counsel, makes findings of fact as follows:
1. This claim was referred to this Court pursuant to Senate Eesolution No. 142 passed on July 30, 1955, which resolution provides as follows:
Resolved, That the bill (S. 641) entitled “A bill for the relief of Joseph H. Lym, doing business as Lym Engineering Company”, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; ana the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall *153 be sufficient to inform the Congress of the nature and character of the demand as a claim, legal, or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
2. Plaintiff is a citizen of the United States and at all times herein mentioned carriéd on a contract construction business in Salt Lake City, Utah, under the name and style of Lym Engineering Company.
3. On February 12,1945, plaintiff submitted his bid in tibe sum of $130,041.36 to the Bureau of Eeclamation, Department of Interior, for construction of a War Food irrigation project at Tucumcari, New Mexico. The purpose of the project was to irrigate certain arid lands in New Mexico for war food production. There was a long irrigation canal on the north and west side of Tucumcari and the work involved the building of laterals and sublaterals from the canal and running down through the area to be irrigated. The project required the building of headgates, siphons, flumes and outlets over an area of approximately 24 square miles.
On the usual building construction project, one supervisor can direct the work of 30 or 40 men. On the irrigation project in suit, however, it was necessary to use many small groups of laborers over a very wide area with a supervisor in charge of each small group. Plaintiff knew when he bid on the contract that he would need to employ a large force of skilled supervisory personnel if the project was to be completed August 1,1945, in the 100 days allotted for completion and at the price bid. When plaintiff submitted his bid on February 12, 1945, he had then in his employ three permanent supervisors consisting of one superintendent and two supervisory foremen. Plaintiff also had in his employ some 60 skilled workmen capable of supervising the small groups of unskilled laborers which would be required on the new project. It was plaintiff’s intention to take his supervisory force to the new project in New Mexico and to recruit from the Tucumcari area the required number of unskilled employees.
4. On about February 15,1945, three days after submitting his bid on the irrigation project, plaintiff completed the other Government war contracts he then had in progress. *154 Under the then existing rules of the War Manpower Commission, an employer was required to release his skilled labor force upon the completion of a contract, but he had the right to reemploy such skilled employees at any time within thirty days. At the expiration of thirty days, the employer had no right to rehire such skilled laborers.[4] The thirty-day period within which the plaintiff could rehire his skilled employees expired on March 15, 1945, by which time the Tucumeari irrigation project contract had not yet been awarded to plaintiff. Knowing that his right to reemploy his skilled labor force would expire on March 15,1945, plaintiff had made frequent inquiry of the Bureau of Keclamation as to the status of his bid. Under the terms of the invitation to bid, the Bureau had 60 days within which to accept or reject the bid. It appears likely that the Bureau would have accepted plaintiff’s bid within the BO days specified by the War Manpower regulations if it had not been for the circumstance that the Bureau required War Production Board approval for the project as an integral part of the War Food Program.
5. The Tucumeari irrigation project had been first authorized in 1938. It was halted in 1942 by the War Production Board, and in April 1944, it was approved by WPB for continuation under the War Food Program until April 1, 1945. On March 13, 1945, the War Production Board extended the terminal date of approval from April 1, 1945, to March 31,1946 for the Tucumeari Project, and on March 19,1945, the irrigation contract was awarded to the plaintiff. By this time, however, plaintiff had lost his right to reemploy the 60 skilled employees, and when plaintiff received his notice to proceed on April 23,1945, he had available only his three permanent supervisors to aid him in recruiting and supervising the new labor force needed for the performance of the irrigation project in New Mexico.
6. The contract provided that performance should be completed in 100 calendar days, making the completion date August 1, 1945. Had the plaintiff had available the skilled laborers which he had lost as a result of the delay in award *155 ing the contract and the application of the rules of the War Manpower Commission, he could have completed the contract in 100 calendar days at a cost of approximately 10 percent below the contract figure of $130,041.36. As a result of the loss of his skilled supervisory labor and the necessity of recruiting and training unskilled labor,[5] on the Tucumcari Project to perform the work under the contract, 289 calendar days were required to complete the performance, and the contract costs far exceeded those which would otherwise have been experienced.
7. Liquidated damages for 189 days of delay in the contract performance were assessed against plaintiff in the sum of $9,450.
8. Almost immediately upon commencing work under the contract, it became obvious that because of the absence of the skilled supervisory labor, the costs of construction were running far in excess of estimated costs. Plaintiff made application to the Bureau of Reclamation to adjust the contract price upward because of this situation. The Bureau of Reclamation, under the First War Powers Act, could have made such an upward adjustment in the contract price provided the conditions specified by the Act were present, but declined to do so. The Act permitted amendments of contracts without consideration provided that such action would aid the prosecution of the war. Plaintiff’s application was not processed until after the hostilities had terminated. Upon completion of the contract and final payment therefor, plaintiff executed a final release, subject to a claim for $9,450 withheld for liquidated damages, and $189,484.95 for increased costs incurred under the contract through no fault or negligence on the part of plaintiff. A written claim for such amounts was submitted to the Bureau of Reclamation. Remission of liquidated damages to the extent of $4,150 was allowed as an allowable adjustment under Article 9 of the contract (the labor shortage was deemed to be an unfore *156 seeable circumstance), but it was never paid to plaintiff because the voucher for this amount submitted to plaintiff by the contracting officer was not executed and returned by plaintiff. The balance of the claim was rejected on the grounds that it called for unliquidated damages which were not within the power of the Bureau of Beclamation to award administratively. This power, which it had formerly under the First War Powers Act, had expired on August 14,1945, in the opinion of the Bureau.
9. The plaintiff made application to the Bureau of Beclamation for his added costs under the contract, pursuant to the provisions of the Act of August 7, 1946, 41 U. S. C. 1946 Ed., Sec. 106, note, which act provided in part :
That where work, supplies, or services have been furnished between September 16,1940, and August 14,1945, under a contract * * * for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the First War Powers Act, 1941, * * *, such departments and agencies are hereby authorized, in accordance with regulations to be prescribed by the President * * *, to consider, adjust, and settle equitable claims of contractors * * * for losses * * * incurred between September 16, 1940, and August 14, 1945, without fault, or negligence on their part in the performance of such contracts * * *.
By administrative decision dated September 3, 1948, the Assistant Secretary of the Interior determined that the loss complained of was incurred without fault or negligence on the part of the plaintiff and ordered that the plaintiff be reimbursed for his losses up to and including August 14,1945, less any profits which the plaintiff had made under other Government contracts during the war period.
10. The Bureau of Beclamation then conducted an audit of plaintiff’s books on the Tucumcari Project and conducted a survey of the plaintiff’s profits on other war contracts. By supplemental administrative decision dated October IT, 1951, by the Acting Assistant Secretary of the Interior, it was held and determined that the portion of the loss on the contract suffered by the plaintiff up to August 14,1945, was $62,049.25. The administrative decision further found that *157 the plaintiff’s profit from other war contracts during the period was $14,080.93 and that the plainiff should be paid the sum of $47,968.32 for the losses incurred by the plaintiff up to August 14, 1945. This sum was subsequently made available to the credit of the plaintiff.
11. The initial and most important cause which gave rise to the delay in completing the contract and the extra cost incurred in the performance of the contract, was the operation of the War Manpower regulation in February and March 1945, which made it impossible for plaintiff to reemploy the 60 skilled employees to supervise the irrigation project at Tucumcari. Other causes which resulted in delay and extra costs were the poor quality of unskilled labor which plaintiff was able to recruit in New Mexico, and the high rate of turnover which continued throughout the performance of the contract. This latter cause did not cease to operate upon the termination of hostilities with Japan on August 14,1945, but continued throughout the entire period of the entire contract performance and occasioned further losses to the plaintiff. These further losses were not the result of any fault or negligence on the part of the plaintiff.
12. The parties have agreed to all of plaintiff’s performance costs after August 14, 1945, except equipment expense and payroll insurance expense, the latter covering workmen’s compensation, public liability and property damages.
The plaintiff employed equipment of the approximate book value of $33,000, which remained on the job until about the middle of April 1946. The contract was accepted as completed on February 6, 1946, and no delays were assessed after that date. Except for a few units, this equipment was actually employed in performance of the work approximately 5.5 months from August 14,1945. A fair and reasonable cost to the plaintiff for its equipment so employed is the sum of $9,823.39.
The plaintiff’s equipment included a one-half cubic yard dragline with a book cost of $8,000 and a TD-9 tractor with a book cost of $4,000 which were taken over from a partnership in which plaintiff had a one-half interest. The original cost of these units to the partnership was $13,000 and $6,700 respectively. The plaintiff contends that his owner *158 ship expense for the use of these units in performing the contract should be determined upon the original cost to the partnership. By applying the same components of expense to the additional cost of $7,700 for these units, the plaintiff’s equipment expense would be increased by $2,117.10.
13. Plaintiff’s payroll taxes of 3 percent for Federal and State unemployment compensation and 1 percent for Federal old-age benefits are not in dispute and amounted to $4,860.52.
Plaintiff incurred liabilities to his bonding and insurance companies in connection with contract performance after August 14, 1945, in the total sum of $9,656.81 for bond premium and for payroll insurance premiums covering workmen’s compensation, public liability and property damage. These premium liabilities were never paid by plaintiff, and the statute of limitations has run against their collection in any legal action against plaintiff. These premium liabilities were true items of performance costs because plaintiff was required to provide a performance bond and to carry payroll insurance. Plaintiff asserts that he desires to, rehabilitate himself in the contract construction business, and that it is essential that he pay the outlawed premiums in order that his credit can be reestablished with bonding and payroll insurance companies.
The bond premium is properly classified as a general expense and would be included in the overhead allowance of 10 percent of job costs, but the payroll insurance premiums are a direct job cost.
In the administrative allowances of plaintiff’s claim, $3,-146.99 was included as costs for workmen’s compensation, public liability and property damage insurance, for performance prior to August 15, 1945. This allowance was based upon rates reflected in the insurance policies and represented approximately 3.93 percent of the payrolls for that period. The plaintiff now claims $2,637.49 for such costs after August 14, 1945, which represents approximately 2.17 percent of its labor payrolls for this period. The sum of $2,637.49 is a reasonable allowance for workmen’s compensation, public liability and property damage insurance after August 14,1945.
*159 14. A reasonable allowance for job supervision and general expense is 10 percent of tlie total job cost.
15. The plaintiff’s total earnings under the contract were $143,600.92. In the settlement of plaintiff’s administrative claim, earnings in the sum of $64,118.66 were allocated to performance prior to August 15, 1945. Earnings on performance after August 14, 1945, were $79,482.26.
The plaintiff was back-charged $984.69 for property damages during performance, and $9,450 as liquidated damages for delay in the completion of the contract, and was paid the net sum of $69,047.57 for his performance of the contract after August 14,1945.
16. The plaintiff suffered losses after August 14, 1945, without his fault or negligence, in the total sum of $111,-080.60, made up of the following:

Performance costs

Labor_$121, 513. 03
Outside services_ 6,874. 46
Materials and supplies_ 13,127.50
Freight and hauling_ 566.35
Miscellaneous job costs_ 4, 350.14
Payroll taxes_ 4, 860. 52
Payroll insurance_ 2, 637.49
Equipment ownership expense_ 9,823.39
Total job costs_ 163, 752. 88
Job supervision and general expense_ 16, 375. 29
Total performance costs. $180; 128.17

Income

Contract earnings_$79, 482.26-
Less:
Miscellaneous damages- $984. 69
Penalty for delay_ 9,450. 00 10,434. 69
Net income. 69, 047.57
Losses in performance after August 14, 1945_ 111, 080. 60
17.The plaintiff had no other Government contracts in force or effect after August 14, 1945. Full adjustment has already been made in the award under 41 U. S. C. 1946 Ed., Sec. 106, as set forth in finding No. 10 above for all profit *160 earned by the plaintiff on other contracts with the Government.
18. As a result of the losses suffered in the contract performance, plaintiff was rendered insolvent and has been prevented from engaging successfully in the contracting business.

 Directive I-VIII of the War Manpower Commission, 7 F. E. 4748; Regulation 7 of the War Manpower Commission, 8 F. E. 1138.

 All skilled labor In the vicinity of the Tucumcari project bad been drafted for essential war activity elsewhere. As soon as plaintiff received the award in March, 1945, he sent out calls to all union offices as far east as Amarillo, Texas, south to Alamogorda, New Mexico, west to Gallup, New Mexico, and *147 north to Denver, Colorado. The “skilled” employees sent to plaintiff were semiskilled workers operating on journeymen cards.

 The contracting officer found that the shortage of skilled labor was an “unforeseeable condition” warranting relief under Article 9 of the contract.

 Directive I-VIII of the War Manpower Commission, 7 F. R. 4748; Regulation 7 of the War Manpower Commission, 8 P. R. 1138.

 All skilled labor in the vicinity of the Tucumcari project had been drafted for essential war activity elsewhere. As soon as plaintiff received the award in March 1945, he sent out calls to all union offices as far east as Amarillo, Texas, south to Alamogorda, New Mexico, west to Gallup, New Mexico, and north to Denver, Colorado. The “skilled” employees sent to plaintiff were semiskilled workers operating on journeymen cards.