Alma **BLABON** et al.

v.

**UNITED STATES.**

Cong. No. 5–54.

United States Court of Claims.

June 3, 1959.

Myron Wiener, Washington, D. C., for plaintiffs.

David Orlikoff, Washington, D. C., with whom was George Cochran Doub, Asst. Atty. Gen., M. Morton Weinstein, Washington, D. C., on the brief, for defendant.

MARIS, Circuit Judge, sitting by designation.

By Senate Resolution 257, adopted June 1, 1954, the United States Senate referred to this court Senate Bill No. 2429, 83d Congress, entitled "A bill for the relief of certain American employees of the former Shanghai Municipal Council." The reference was made under sec-

tions 1492 and 2509 of title 28, United States Code, with the request to "proceed expeditiously with the same, in accordance with the provisions of said sections, and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimants." Following the reference seven of the claimants named in the Senate bill and the personal representatives of three others, all of whom we shall call plaintiffs, filed petitions in this court under Rule 18, 28 U.S.C. The petitions claim wages, pensions and other benefits due the plaintiffs, or their decedents, under their terms of employment with the Shanghai Municipal Council. The plaintiffs assert that they have been deprived of the amounts claimed by reason of the action of the United States in relinquishing its extraterritorial rights in China and joining with Great Britain in rendering back to China the Shanghai International Settlement and thus terminating the Shanghai Municipal Council without providing the necessary safeguards to ensure that the Chinese Government would assume and pay the amounts due the plaintiffs by the Council.

The International Settlement at Shanghai, China, had its origin in a set of Land Regulations which were promulgated pursuant to separate treaties entered into by China with foreign nations, including the United States, by which the Treaty Powers acquired extraterritorial rights in China.[1] The Shanghai Municipal Council, the governing body of the Settlement, was endowed with general powers of municipal admin-

istration. It levied and collected taxes, exercised normal local governmental powers, entered into contracts, and operated the ordinary municipal facilities. It consisted of 14 members elected by qualified taxpayers residing in the Settlement. The Council owned the assets of the Settlement, holding land, public buildings, facilities, securities and cash. It could sue and be sued in specially constituted consular courts.

The plaintiffs were employed in various positions by the Council in the administration of its municipal functions. The United States was not responsible or in any way concerned with the recruitment of the plaintiffs or any other persons employed by the Council. Their salaries were paid in local Chinese currency. Under the terms of employment the plaintiffs were entitled to increases in pay, holidays, leave, medical benefits, retirement on pension at ages 50 or 55 after 20 years continuous service, and to withdrawals from the Superannuation Fund to which contributions were made both by deductions from plaintiffs' salaries and by the Council. In March 1937, when the terms of employment were revised, Chinese currency and the rates of its exchange into pounds, dollars and yen were relatively stable. An employee on retirement would be paid in local currency the amount to his credit in the Superannuation Fund (his own and the Council's contributions). It was assumed that he would be able to derive a return from this amount of 5 percent per annum. Deducting the amount of this assumed return from one-half the employee's salary at the date of his retirement, the Council would pay him the difference quarterly as a pension. Although the difference was determined in local currency it was payable, in the case of a foreign employee, either in local currency or in foreign currency at fixed

1. For brief reviews of the events leading to the signing of these treaties and of the rights held by the United States thereunder see The Chinese Exclusion case (Chae Chan Ping v. United States), 1889, 130 U.S. 581, 590–593, 9 S.Ct. 623, 32 L.Ed. 1068; Reid v. Covert, 1957, 354 U.S. 1, 60–61, 77 S.Ct. 1222, 1 L.Ed.2d 1148; 2 Hyde, International Law, 2d Rev. Ed., pp. 868–871, and the findings of fact set out below.

rates of exchange, at the option of the employee. In 1941 the terms of employment were revised to provide, inter alia, that in the case of a foreign employee payment would be made in the "Council's discretion either in the alternative currency applicable or in local currency."

During 1931 the Japanese had invaded Manchuria and by July 1937, the hostilities had been extended into China proper. The Chinese economy was from that time forward subjected to the strain of a life and death struggle. By 1939 inflation had so affected the Chinese currency that the Shanghai Municipal Council found it necessary to supplement salaries with extra allowances for the cost of living. By 1940 these allowances exceeded 100 percent of the base pay.

On December 8, 1941, following the attack on Pearl Harbor and the declaration of war between Japan and the United States and Great Britain, the Japanese took control of the Settlement and the Council. Three of the plaintiffs had left China and were residing in the United States before this event. Seven of the plaintiffs continued to work for the Council until they were interned by the Japanese. In 1943 the Council was replaced by a Japanese puppet regime. Between 1943 and 1945 the seven plaintiffs were repatriated to the United States.

On January 11, 1943, Great Britain and the United States signed separate treaties with the Republic of China relinquishing their extraterritorial rights in China. Subsequently, other treaty powers entered into similar treaties with China. The pertinent provisions of the United States treaty are as follows:

> "The United States of America and the Republic of China, desirous of emphasizing the friendly relations which have long prevailed between their two peoples and of manifesting their common desire as equal and sovereign States that the high principles in the regulation of human affairs to which they are committed shall be made broadly effective, have resolved to conclude a treaty for the purpose of adjusting certain matters in the relations of the two countries * * *

> * * * * * *

> "ARTICLE III

> "The Government of the United States of America considers that the International Settlements at Shanghai and Amoy should revert to the administration and control of the Government of the Republic of China and agrees that the rights accorded to the Government of the United States of America in relation to those Settlements shall cease.

> "The Government of the United States of America will cooperate with the Government of the Republic of China for the reaching of any necessary agreements with other governments concerned for the transfer to the Government of the Republic of China of the administration and control of the International Settlements at Shanghai and Amoy, including the official assets and the official obligations of those Settlements, it being mutually understood that the Government of the Republic of China in taking over administration and control of those Settlements will make provisions for the assumption and discharge of the official obligations and liabilities of those Settlements and for the recognition and protection of all legitimate rights therein." 57 Stat. 767, 769.

In September 1945 Japan surrendered. China was liberated and control of the Settlement at Shanghai passed to the Government of China pursuant to the treaties. The old Shanghai Municipal Council was not reestablished by the Government of China. In 1946 a Liquidation Commission was appointed, consisting of eight Chinese officials, to consider the problems connected with the administration and control of the former Shanghai Municipal Council, including specifically its obligations to its

former employees. Attached to the Liquidation Commission were four Foreign Advisers representing the Governments of the United States, Great Britain, Switzerland, and The Netherlands. The Liquidation Commission appointed a subcommittee consisting of the four Foreign Advisers and four Chinese members to determine the rights of the former employees of the Council and to make recommendations thereon to the Commission. The subcommittee began its deliberations in November 1946. Differences arose as to whether the cutoff date for determining the Council's obligations to its employees was December 8, 1941, when Shanghai fell into the control of the Japanese, or September 30, 1945, the date on which China took control of the Settlement. It was agreed that provisional payment of superannuation and pension benefits be ascertained to December 8, 1941, without prejudice to the ultimate determination of the proper cutoff date. A controversy then arose over the conversion rates to be used in calculating these amounts. The 1941 revision of the terms of service provided for payment of superannuation withdrawals "either in the alternative currency applicable or in local currency" at the Council's discretion. The Foreign Advisers contended that the 1941 provision should be read in the light of its 1937 antecedent. Complete deadlock ensued within six months after the deliberations of the Liquidation Commission were begun. The crux of the controversy was the question as to who should bear the burden of inflation. It was agreed to refer these questions, namely, that of the cutoff date and the foreign currency payments, to Nanking for diplomatic consideration, the Chinese reporting to their Government and the Foreign Advisers reporting to their respective Ministers. Such reports were made, but nothing came of the diplomatic exchanges. The subject was still under consideration when the Chinese Communists occupied Nanking and Shanghai in the Spring of 1949.

Meanwhile a separate determination of the obligations of the former Council to its employees was made in a study by the British Government as a result of which the accounts of the Council's former employees were tabulated in a document called the Morcher Document. In July 1947 the Foreign Advisers predicated their recommendations to the Liquidation Commission upon its contents, with some modifications. In 1943 the British Government had advanced amounts due from the Council to pensioners and in 1949 it made ex gratia payments to British nationals formerly employed by the Council. The plaintiffs compute their claims upon the figures shown in the Morcher Document, the solutions proposed by the Foreign Advisers, and the British terms of settlement, claiming that a total of about $224,648.39 is due them under their employment contracts, payment of which they urge this court to recommend to the Congress. The United States, on the other hand, asks that we report that there is no legal or equitable basis for the allowance of these claims.

█ The plaintiffs contend that equities arose in their favor as a result of the effect upon them of what they characterize as the precipitate action of the United States in signing the treaty of relinquishment without providing adequate safeguards for the protection of their interests. This action, they say, deprived them to their detriment of legal remedies which might otherwise have been available to them.

We think that the charge is wholly unfounded that the action of the United States in signing the treaty of relinquishment was "precipitate". The Government of the United States, as early as the Treaty of October 8, 1903,[2] had announced its intention of relinquishing its extraterritorial rights in China when that country's legal and judicial systems had been sufficiently modernized and reformed. During the ensuing 40 years it was clear that events were proceeding in the direction of the relinquishment of

2. 33 Stat. 2208, 2215.

such rights. Thus, the Washington Conference of 1921–1922 by resolution [3] and the Nine-Power Treaty of February 6, 1922,[4] which followed the Conference, expressed sympathy with China's desire to eliminate extraterritoriality. At the same time a Commission was established to determine whether the relinquishment of extraterritorial rights was then feasible. The Commission reported in 1926, pointing out the deficiencies which still must be cured in order to bring China's law and procedure into conformity with the standards of the Western nations. In 1926, the Secretary of State of the United States again expressed the willingness of this country to continue negotiations on the subject. Then in 1929 the National Government of China announced the end of extraterritoriality, effective January 1, 1930. The date was subsequently postponed to January 1, 1932, and the proposal was not then carried out because of the Japanese invasion of Manchuria.

The treaty of relinquishment which was signed on January 11, 1943 was a war measure. The Japanese had overrun eastern China and the Chinese Nationalist Armies had retreated to Chungking in the far western fastness of Szechwan Province. There was a grave danger that they would give up the struggle and come to terms with the Japanese who, under the slogan of "Asia for the Asiatics" were appealing to the Chinese to turn on the "Western imperialists" and join the "co-prosperity sphere". In this critical juncture the United States and Great Britain deemed it essential to give up their extraterritorial rights in China in order to give the Chinese National Government the greatest possible encouragement and prevent its threatened collapse. It would appear that nothing else could have served better to accomplish the dual purpose of counteracting anti-Western Japanese propaganda and reviving the Chinese Nationalists' flagging spirits. For the foreign extraterritorial rights had always been regarded by the Chinese as a badge of inferiority. Their relinquishment thus reestablished China as a sovereign nation equal in dignity to those of the West.

Nor do we think that the plaintiffs are correct in their contention that the provisions of the treaty of relinquishment for the assumption and payment by the Government of China of the claims of the plaintiffs and others against the Shanghai Municipal Council were so inadequate and unsafeguarded as to give rise to an equity in their favor against the United States. On the contrary, it seems clear that they were the normal, usual provisions included for such purposes in a treaty with a friendly government. Certainly it was not a departure from customary practice in such circumstances to accept as adequate assurance of performance the formal agreement of the Chinese Government that it would "make provision for the assumption and discharge of the official obligations and liabilities of those Settlements [at Shanghai and Amoy] and for the recognition and protection of all legitimate rights therein." Indeed, we have been referred to no instance in the diplomatic history of the United States in which security for the payment of claims, such as the retention of physical assets, has been obtained under such circumstances. Certainly such special security for the payment of claims was not obtained by the United States in connection with its relinquishment of extraterritorial rights and foreign settlements in Japan in 1894,[5] by Belgium-Luxembourg, Norway, Canada, Sweden, and The Netherlands when they relinquished their extraterritorial rights in China in 1943, 1944 and 1945, or by the United States when it agreed to the abolition of the interna-

3. Treaties, Conventions, International Acts, Protocols, and Agreements between the United States of America and other Powers, 1910–1923, vol. III, p. 3131.

4. 44 Stat. 2113. See 2 Hyde, International Law, 2d Rev. Ed., pp. 868–871.

5. See Article XVII, Treaty of November 22, 1894, between the United States and Japan, 29 Stat. 848, 853. See also, 1 Hyde, International Law, 2d Rev. Ed., § 126.

tional regime in Tangier, Morocco, in 1956.[6]

This brings us to the plaintiffs' contention that the treaty of relinquishment deprived them of remedies for the enforcement of their claims, to their financial detriment. To support this contention the plaintiffs rely on the proposition that the history of the Council warrants the conclusion that it would have liquidated its liabilities to its employees before it handed over its assets and responsibilities to its successor, if it had been permitted to do so. Therefore, say the plaintiffs, the United States interfered, without legal justification or excuse, in the status which existed between the plaintiffs and the Council by aiding in the transfer to China of the administration and control of the assets and liabilities of the International Settlement. This contention brings us to the crux of this case, namely, whether there are equitable considerations, within the meaning of section 2509 of title 28, United States Code, which furnish any support for the plaintiffs' claims. For the plaintiffs concede that the circumstances do not support legal claims on their part against the United States.

The position of the United States is that the loss of plaintiffs' employment with the Shanghai Municipal Council and the emoluments thereof did not arise by reason of any wrongful or inequitable act upon the part of this Government which would bring the case within the broad principles of equity described by this court in Burkhardt v. United States, 1949, 84 F.Supp. 553, 113 Ct.Cl. 658. In the Burkhardt case the plaintiffs were deprived of the use of their property by the United States in the exercise of its paramount right to improve commerce and navigation, for which there was no recourse in a court of law. Relying upon United States v. Realty Company, 1896, 163 U.S. 427, 440, 16 S.Ct. 1120, 41 L.Ed. 215, this court held that the term "equitable claim", which appears in section 2509, is used in the broad moral

sense of a claim based upon general equitable considerations, a claim binding in honor and good conscience even though not entitled to recognition in a court of law. While the plaintiffs concede that there was no "taking" of their property for public use by the United States, such as was found by this court to have occurred in Gray v. United States, 1886, 21 Ct.Cl. 340, they contend that there is, nonetheless, a moral obligation upon the United States in their favor. But the plaintiffs do not tell us how the United States failed in the fulfillment of any such obligation to them.

That the treaty was a proper subject of negotiation is undisputed. Its purpose is self-evident, namely, the giving up of extraterritorial rights in China. But, urge the plaintiffs, the United States instead of exacting a promise from the Chinese National Government to satisfy the obligations of the Shanghai Municipal Council should have retained the right to physical control of its assets by the Council because the Council would have honored its obligations to its employees before turning its assets over to China. This argument is based upon a speculative premise, however. For there is no evidence as to the financial condition of the International Settlement after the Japanese occupation. Nor is there any certainty as to how the Council would have settled these claims in view of the inflationary situation which then existed. For by the time the International Settlement was liberated from the Japanese in September 1945, and thereafter, the Chinese currency had so far been subject to inflation that the official rate of conversion of Chinese dollars into either pounds or United States dollars was no more than a euphemism.

All that the record shows is that on September 30, 1945, the Government of China took control of the Shanghai International Settlement, over which it had always had sovereignty subject only to the treaties granting extraterritorial rights therein, and with it the assets of the

6. United States Treaties and other International Agreements, vol. 7, part 3 (1956), p. 3043.

Shanghai Municipal Council and that negotiations were started for the recognition and payment by that Government of the claims against the Council, including the plaintiffs' claims. There is no suggestion that these negotiations were not conducted in good faith. The difficulty, of course, was that the question as to the currency in which the claims were to be paid had not been resolved when the Chinese Communists overran the mainland.

 We think that the losses suffered by the plaintiffs did not result from any action of the United States but rather from circumstances beyond the control of any of the parties concerned. For the claims of the plaintiffs must be viewed realistically in the light of the history of events which took place in China during the period in question. The inescapable basic fact is that for many years prior to the treaty of relinquishment the Japanese forces had been in possession of eastern China and that immediately after Pearl Harbor they moved into the International Settlement at Shanghai and thereafter terminated the functioning of the Shanghai Municipal Council, interning the seven plaintiffs who were still there, and later establishing a puppet government of their own. Thus, it was the Japanese occupation and not the treaty of relinquishment which actually terminated the Shanghai Municipal Council as a functioning body and ended the plaintiffs' services to it. It thus appears that the relinquishment of extraterritorial jurisdiction by the United States and the giving up of its rights in the Shanghai International Settlement was but the recognition of an accomplished fact and of the inexorable march of history.

It is true, of course, that the plaintiffs have not realized anything upon their claims from the Chinese Government under the treaty of relinquishment. But this is primarily because of the tremendous inflation of the Chinese currency which took place during and after the war. The United States, however, was not responsible for this inflation. It was an economic fact of life in China during that period which affected everyone who lived there and which doubtless caused untold hardship and financial loss to millions. And the subsequent history of the Chinese National Government, its loss of China proper to the Chinese Communists and its retreat to Formosa, appears to have made further progress in the negotiations for settlement economically impossible.

We conclude that the claims of the plaintiffs are not supportable either at law or upon the broader moral principles of equity recognized in Burkhardt v. United States, 1949, 84 F.Supp. 553, 113 Ct.Cl. 658. Whether or not anything should be paid to them as a gratuity rests, of course, within the sole discretion of the Congress. If the Congress should determine to authorize payments ex gratia to be made amounts appropriate to be paid are set out in Table 7 annexed to the findings of fact.

This opinion, together with the findings of fact which follow, will be certified to the Congress pursuant to Senate Resolution 257, 83d Congress.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.