**BURKHARDT et al. v. UNITED STATES.**

Cong. No. 17851.

United States Court of Claims.

June 6, 1949.

See also *82 F.Supp. 333.*

R. M. Rieser, Madison, Wis., for plaintiffs.

Herbert Pittle, Washington, D. C., with whom was Assistant Attorney General A. Devitt Vanech, for defendant.

Before JONES, Chief Justice, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

HOWELL, Judge.

On February 6, 1940, the Willow River Power Company, predecessor in interest of the plaintiffs in the present case, filed suit No. 45067 in the Court of Claims to recover for the loss of the power capacity of its hydroelectric plant, located near the confluence of the Willow River and the St. Croix River, caused by the action of the United States in raising the water level of the St. Croix River by the erection of a dam described as the Red Wing Dam. The dam erected by the United States, by raising the water level of the St. Croix River, interfered with the operation of the tailrace of the plaintiff's power plant.

After further pleadings by the parties, testimony was taken and on February 18, 1943, Commissioner Ewart W. Hobbs filed his report. Both parties filed exceptions to the Commissioner's report. The case was then argued and on February 7, 1944, this Court made Special Findings of Fact and decided that the plaintiffs were entitled to damages of $25,000 and interest, as just compensation for a taking of its property. Willow River Power Co. **v.** United States, 101 Ct.Cl. 222.

The special findings of fact made by the court in that trial, and which we again find herein and report to the Senate under Senate Resolution 231, are as follows:

"1. The plaintiff, Willow River Power Company, is a public utility company of the State of Wisconsin. During the times here involved it developed electric power hydraulically and by other means and sold it to the surrounding community. Its power plant was located near the confluence of the Willow River and the St. Croix River, in the city of Hudson, Wisconsin, on land owned by it above ordinary high water of the St. Croix River.

2. Willow River is a nonnavigable stream in the State of Wisconsin and enters the St. Croix River at Hudson. The St. Croix River is a navigable stream, in its lower reaches forming the boundary between Wisconsin and Minnesota. It enters the Mississippi River, also a navigable stream, at Prescott.

In times past logs were boomed down portions of the Willow River in times of spring freshets by means of dams and sluices. This industry has long since been abandoned. Dams erected for that special purpose were in course of time succeeded by dams erected for the single purpose of developing electric power hydraulically.

3. The plaintiff operates four such plants on the Willow River.

Beginning near the mouth of the river, at Hudson, is a plant which, before the cause of action here complained of, had a maximum head of 22½ feet, known as the St. Croix plant, and is the plant here in controversy. It has two 150-kilowatt generators attached to vertically operated turbines.

The next one upstream is the Little Falls plant, with a maximum head of 22 feet and a unit of 300 kilowatts.

The third one in order is the Willow Falls plant, with a maximum head of 107 feet, with two 300-kilowatt generators.

The fourth one upstream is the Mounds plant, with a head of 50 feet and a 180-kilowatt generator.

These four plants form a system and are operated by plaintiff as such.

None of the dams has locks or sluiceways, and none is provided with passage for any form of vessel.

The dam at the St. Croix plant is the oldest of the dams and was erected in the latter part of the 19th century.

4. The St. Croix River enters the upper Mississippi at Prescott, and from Prescott to slightly beyond Stillwater on the St. Croix, upstream from the junction of the Willow River and the St. Croix River, the St. Croix is in the form of a greatly elongated lake.

Pursuant to Congressional authorization, defendant erected near Red Wing, Minnesota, a dam designated No. 3 and hereinafter termed the "Red Wing Dam." The pool created above the dam had an ordinary height of 675 feet above mean sea level and extended up the Mississippi and to Stillwater on the St. Croix River, or beyond plaintiff's St. Croix plant.

The pool was created by the Red Wing Dam August 12, 1938.

Where the waters of Willow River empty into Lake St. Croix through the St. Croix plant, the ordinary level of Lake St. Croix after the erection of the Red Wing Dam was approximately 675.3 feet.

The Red Wing Dam may be operated in such manner that in times of flood the current may be allowed to flow as under natural conditions, except for a slight swell. It is located about 15 miles downstream from the junction of the St. Croix and Mississippi Rivers. Hudson is about 15 miles upstream on the St. Croix River from Prescott.

5. Before creation of the pool back of the Red Wing Dam the ordinary high-water level of Lake St. Croix at plaintiff's St. Croix plant was 672 feet mean sea level. The Red Wing pool did not affect the levels of Willow River, but it did raise the ordinary high-water marks of Lake St. Croix at plaintiff's St. Croix plant about 3 feet, raising the water level in the tailrace of plaintiff's plant by that amount, which decreased the head of plaintiff's dam by 3 feet. This diminished plaintiff's hydroelectric power at the St. Croix plant. The head above ordinary high water before the erection of the Red Wing Dam was 17 feet.

In order to make up this deficiency plaintiff entered into a contract with Northern States Power Company, October 10, 1938, whereby the Northern States Power Company agreed to supply electric current to the plaintiff "to the extent of Five Hundred (500) Kilowatts of Demand, for Customer's (plaintiff's) use for light, heat, and power, for public and private use in the communities and rural areas now served from Customer's transmission and distribution system," the energy thus supplied to be used as auxiliary to the plaintiff's own generating facilities. A copy of this contract is marked in evidence as plaintiff's exhibit "S" and is made a part hereof by reference.

This energy was to be delivered to plaintiff at the plant of the Northern States Power Company. In order to transmit it to plaintiff's plant it was necessary to build a transmission line, which was done at a cost of $21,000.

6. The value of the loss in power as a result of the raising of the level of the St. Croix River by 3 feet above ordinary high water was $25,000 at the time and place of taking.

7. The plaintiff abandons its claim with respect to destruction of site for a dam and possible waterpower head on the Apple River, and no findings in connection therewith are made.

The Court concluded that:

"Taking all relevant proof into consideration, we have arrived at an amount of $25,000, by way of a jury verdict, as justly compensating the plaintiff for that which the defendant has taken from it, as of the time and place of taking, adding thereto and as a part thereof 4½ per cent per annum on $25,000 from August 12, 1938, down to the date of payment of judgment."

The Government moved for a new trial and for amended and additional findings of fact. That motion was overruled and thereafter a petition for a writ of certiorari was granted, 323 U.S. 694, 65 S.Ct. 68, 89 L.Ed. 561, and the judgment of this court was reversed by the Supreme Court, 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101. On May 7, 1945, this court filed its order dismissing the petition pursuant to the mandate of the Supreme Court, and entered judgment in favor of the United States.

On February 21, 1947, the following bill was introduced in the United States Senate:

"80th Cong., 1st Sess.
"S. 662

"Be it enacted by the Senate and the House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the Willow River Power Company, of Hudson, Wisconsin, the sum of $31,160, in full satisfaction of its claim against the United States for compensation for damages resulting from diminution of the generative capacity of its hydroelectric plant located near the confluence of the Willow River and the St. Croix River due to a rise in the waters of the St. Croix River caused by the erection by the United States of a dam across the Mississippi River, near Red Wing, Minnesota, in 1938: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000."

On May 24, 1948, the Senate passed the following resolution:

"S. Res 231

"Resolved, That the bill S. 662, for the relief of the Willow River Power Company, with the accompanying papers, is hereby referred to the Court of Claims in pursuance of section 151 of the Judicial Code (28 U.S.C., sec. 257), for such action as the court may take in accordance therewith."

Sections 1492 and 2509 of 28 U.S.C.A. supersede Section 151 of the Judicial Code. Sections 1492 and 2509 provide as follows:

"Sec. 1492:

"The Court of Claims shall have jurisdiction to report to either House of Congress on any bill referred to the court by such House, except a bill for a pension, and to render judgment if the claim against the United States represented by the referred bill is one over which the court has jurisdiction under other Acts of Congress."

"Sec. 2509:

"Whenever any bill, except for a pension, is referred to the Court of Claims by either House of Congress, such court shall proceed with the same in accordance with its rules and report to such House, the facts in the case, including facts relating to delay or laches, facts bearing upon the question whether the bar of any statute of limitation should be removed, or facts claimed to excuse the claimant for not having resorted to any established legal remedy.

"The court shall also report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

The Supreme Court in reversing the judgment of this court, 324 U.S. 499, page 509, 65 S.Ct. 761, page 767, 89 L.Ed. 1101, in its conclusion used the following language:

"It is conceded that the riparian owner has no right as against improvements of navigation to maintenance of a level below high-water mark, but it is claimed that there is a riparian right to use the stream for run-off of water at this level. High-water mark bounds the bed of the river. Lands above it are fast lands and to flood them is a taking for which compensation must be paid. But the award here does not purport to compensate a flooding of fast lands or impairment of their value. Lands below that level are subject always to a dominant servitude in the interests of navigation and its exercise calls for no compensation. United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064; Willink v. United States, 240 U.S. 572, 36 S.Ct. 422, 60 L.Ed. 808. The damage here is that the water claimant continues to bring onto its lands through an artificial canal from the Willow River has to leave its lands at an elevation of 675 instead of an elevation of 672 feet. No case is cited and we find none which holds a riparian owner on navigable waters to have such a legal right. The Cress case [1] which the Court of Claims relied upon does not so hold and does not govern here.

"Rights, property or otherwise, which are absolute against all the world are certainly rare, and water rights are not among them. Whatever rights may be as between equals such as riparian owners, they are not the measure of riparian rights on a navigable stream relative to the function of the Government in improving navigation. Where these interests conflict they are not to be reconciled as between equals, but the private interest must give way to a superior right, or perhaps it would be more accurate to say that as against the Government such private interest is not a right at all.

"Operations of the Government in aid of navigation ofttimes inflict serious damage or inconvenience or interfere with advantages formerly enjoyed by riparian owners, but damage alone gives courts no power to require compensation where there is not an actual taking of property. Cf. Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; Scranton v. Wheeler, 179 U.S. 141, 21 S.Ct. 48, 45 L. Ed. 126; Bedford v. United States, 192 U.S. 217, 24 S.Ct. 238, 48 L.Ed. 414; Jackson v. United States, 230 U.S. 1, 33 S.Ct. 1011, 57 L.Ed. 1363; Hughes v. United States, 230 U.S. 24, 33 S.Ct. 1019, 57 L.Ed. 1374, 46 L.R.A., N.S., 624; Cubbins v. Mississippi River Commission, 241 U.S. 351, 36 S.Ct. 671, 60 L.Ed. 1041. Such losses may be compensated by legislative authority, not by force of the Constitution alone.

\* \* \* \* \* \*

"We hold that claimant's interest or advantage in the high-water level of the St.

---

[1] United States v. Cress. 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746. With reference to this case the Supreme Court in the body of its opinion in the Willow River case had this to say, 324 U.S. page 506, 65 S.Ct. page 766:

"We are of opinion that the Cress case does not govern this one and that there is no warrant for applying it, as the claimant asks, or for overruling it, as the Government intimates would be desirable. The Government there was charged with the consequences of changing the level of a nonnavigable stream; here it is sought to be charged with the same consequences from changing the level in a navigable one. In the former case the navigation interest was held not to be a dominant one at the property damaged; here dominance of the navigation interest at the St. Croix is clear. And the claimant in this case cannot stand in the Cress shoes unless it can establish the same right to have the navigable St. Croix flow tail waters away at natural levels that Cress had to have the nonnavigable stream run off his tail waters at natural levels. This could only be done by an extension of the doctrine of the Cress case. As we have already said, it 'must be confined to the facts there disclosed.' United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 597, 313 U.S. 543, 61 S.Ct. 772, 775, 85 L.Ed. 1064."

Croix River as a run-off for tail waters to maintain its power head is not a right protected by law and that the award below based exclusively on the loss in value thereof must be reversed."

On August 23, 1948, Bertha A. Burkhardt, Helene E. Schultz and Hugh F. Gwin, as trustees and successors to the Willow River Power Company, the plaintiff in case No. 45067, filed a petition in this court, docketed as Congressional Reference No. 17851 and referred to Senate Resolution 231 and Rule 18 of the Revised Rules of this Court, 28 U.S.C.A. In their petition, the plaintiffs repeated substantially the allegations which comprised the first cause of action in case No. 45067.

The United States moved to dismiss the case on the ground that this Court was without jurisdiction to rehear and again decide the issues of fact and law because the issues were res judicata by virtue of a final judgment of this court in the previous case.

On February 7, 1949, this court overruled the defendant's motion to dismiss and rendered an opinion, 82 F.Supp. 333, the conclusion of which is set out below.[2]

This report thus far has been merely a recital of facts which is intended to present the whole story of this case without resort to reference except by way of amplifying opinions of this and the Supreme Court of the United States.

Under the resolution (S.Res. 231) and pursuant to Sec. 2509 of the Judicial Code, which in part supersedes Section 151 of the Judicial Code, this court shall "report conclusions sufficient to inform Congress whether the demand is a legal or equitable claim or a gratuity, and the amount, if any, legally or equitably due from the United States to the claimant."

The Government contends that Congress used the term "legal or equitable claim" in Section 2509 of the Judicial Code, supra, in its strict legal sense and not in a broad general sense meaning "moral claim," and submits that the claim of the plaintiffs is not an "equitable claim" as that term is used.

A consideration of the facts above and the decision of the Supreme Court reveals that these plaintiffs have been deprived of the use of their property by the United States in the exercise of its paramount right under the Constitution to improve commerce and navigation. But for this superior right the Government would be required to pay "just compensation" for the taking of plaintiffs' property under the Fifth Amendment to the Constitution.

Accordingly, plaintiffs do not have a right either in law or in equity to recover compensation from the Government. However, it does not logically follow that plaintiffs do not have an "equitable" claim against the Government in a broad non-juridical sense.

The Supreme Court in its opinion, United States v. Willow River Power Co., supra, 324 U.S. page 510, 65 S.Ct. page 767, 89 L.Ed. 1101, indicates as much when, in holding that this type of damage alone does not give the courts power to award compensation where there is not an actual taking of property, it points out that, "Such losses may be compensated by legislative authority, not by force of the Constitution alone."

This court has previously had occasion to consider a special jurisdictional act of Congress, Act Oct. 14, 1940, 54 Stat. 1389, which conferred jurisdiction upon the court "to enter such decree or judgment against the United States for such loss and damage as equity and justice shall require," Lamborn and Company v. United States, 65 F.Supp. 569, 577, 106 C.Cl. 703, and especially the Government's contention that the court was limited by that act to the determination of whether plaintiff had a legal or equitable claim in the strict sense of that term as usually applied in a court of law and equity. We interpreted the special act of Congress to mean "equity and justice" in its broad meaning rather than in the strict sense in which such term is un-

---

[2] This cause should be set down in order that a determination can be made as to the kind of report which should be submitted to the Senate based upon suggestions of the parties as well as the determination of the court.

derstood and applied in equity jurisprudence. 65 F.Supp. page 576, 106 Ct.Cl. page 723.

It has also been established by the decisions of this Court and the Supreme Court that Congress not only has authority to create a cause of action where none existed before but to make an appropriation to pay such claim. Garrett v. United States, 70 C.Cl. 304.

In Pope v. United States, 323 U.S. 1, 9, 65 S.Ct. 16, 21, 89 L.Ed. 3, the Supreme Court said:

"We perceive no constitutional obstacle to Congress' imposing on the Government a new obligation where there had been none before, * * *. the power of Congress to provide for the payment of debts, conferred by § 8 of Article I of the Constitution, is not restricted to payment of those obligations which are legally binding on the Government. It extends to the creation of such obligations in recognition of claims which are merely moral or honorary."

We are therefore of the opinion that the term "equitable claim" as used in 28 U.S.C.A. § 2509, is not used in a strict technical sense meaning a claim involving consideration of principles of right and justice as administered by courts of equity, but the broader moral sense based upon general equitable considerations. In United States v. Realty Company, 163 U.S. 427, at page 440, 16 S.Ct. 1120, at page 1125, 41 L.Ed. 215, the Supreme Court said:

"Under the provisions of the constitution (article 1, § 8) congress has power to lay and collect taxes, etc., 'to pay the debts' of the United States. Having power to raise money for that purpose, it of course follows that it has power, when the money is raised, to appropriate it to the same object. What are the debts of the United States within the meaning of this constitutional provision? It is conceded, and, indeed, it cannot be questioned, that the debts are not limited to those which are evidenced by some written obligation, or to those which are otherwise of a strictly legal character. The term 'debts' includes those debts or claims which rest upon a merely equitable or honorary obligation, and which would

not be recoverable in a court of law if existing against an individual. The nation, speaking broadly, owes a 'debt' to an individual when his claim grows out of general principles of right and justice,—when, in other words, it is based upon considerations of a moral or merely honorary nature, such as are binding on the conscience or the honor of an individual, although the debt could obtain no recognition in a court of law. The power of congress extends, at least, as far as the recognition and payment of claims against the government which are thus founded. To no other branch of the government than congress could any application be successfully made, on the part of the owners of such claims or debts, for the payment thereof. Their recognition depends solely upon congress, and whether it will recognize claims thus founded must be left to the discretion of that body. Payments to individuals, not of right, or of a merely legal claim, but payments in the nature of a gratuity, yet having some feature of moral obligation to support them, have been made by the government, by virtue of acts of congress appropriating the public money, ever since its foundation. Some of the acts were based upon considerations of pure charity. * * *"

In this case, plaintiffs actually have more than a "merely equitable or honorary obligation, (and) which would not be recoverable in a court of law if existing against an individual." It must be conceded that had they been so deprived of their property by private individuals not holding a dominant easement entitling them to raise the water level, they would have been entitled to compensatory damages for such taking in a court of law. But as pointed out above, the higher authority of the Constitution of the United States creates superior rights in the Government against all of its citizens which render its taking of private property under these circumstances a "privileged taking."

It must be recognized that the private property of citizens of the United States is at all times "impressed" with the superior rights of the Government inci-

dental to the express power to regulate commerce. Leovy v. United States, 177 U.S. 621, 632, 20 S.Ct. 797, 44 L.Ed. 914. In other words, the title to all lands submerged and along the shores of navigable streams is at all times subject to the servitude in respect of navigation created in favor of the Federal Government by the Constitution. Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063.

What has happened to these plaintiffs has happened many times before to others, as it is bound to happen to others in the future. Under our views, whether these or any other plaintiffs are to be compensated by the Government for the taking of their property is a matter exclusively for the determination of Congress.

The amount involved in this claim, as previously determined, after taking all relevant proof into consideration, which would represent fair and reasonable compensation for the loss and damage sustained by these plaintiffs as of the time and place of the operations by the Government which affected the use of their property as shown in findings is $25,000.

If the plaintiffs should, in the opinion of Congress, receive an amount in addition to the $25,000 to fully compensate them contemporaneously with the loss sustained, a reasonable rate of interest at $4\frac{1}{2}$ percent per annum would be a fair measure.

It is ordered that the foregoing opinion of the court be transmitted to the Senate, in accordance with the Act of March 3, 1911, 36 Stat. 1087, as amended by the Act of June 25, 1948, 28 U.S.C.A. §§ 1492, 2509.