**MOORLAND COURT, INC.**
v.
**The UNITED STATES.**
Cong. No. 5–61.

United States Court of Claims.
March 18, 1966.

---

Harold B. Hutchinson, Portland, Or., attorney of record, for plaintiff. Denton G. Burdick, Jr., and John R. Sabin, Portland, Or., of counsel.

John G. Roberts, Washington, D. C., with whom was Asst. Atty. Gen., John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DURFEE, Judge.

This case is before us pursuant to a Congressional reference.[1] Plaintiff has conceded that due to the running of the statute of limitations,[2] it has no legal claim. The sole question before us, therefore, is whether or not plaintiff has an equitable claim in the sense that that concept has developed in our Congressional reference jurisprudence. Burkhardt v. United States, 84 F.Supp. 553, 113 Ct.Cl. 658 (1949).

Plaintiff, an Alaska corporation, was organized in 1953 in compliance with section 207 of the National Housing Act, as amended, 12 U.S.C. § 1713, as amended (1964 ed.). It was plaintiff's purpose to become a mortgagor under a Federal Housing Administration (FHA) Commitment for Insurance. In February, 1953, an application for Mortgage Insurance was submitted to FHA by the Sparkman and McLean Company of Seattle, as the proposed mortgagee, and by the sponsors of plaintiff as the proposed mortgagor. The sponsors of the proposed mortgagor were set forth as W. A. Rushlight of Portland, Oregon and Cash Cole of Fairbanks, Alaska. The proposed project "Moorland Court" was to be located in Fairbanks, and to consist of "1 and 2 Story Frame Walk Up Garden Apartments," comprising 200 units. It was planned that the project would be built on a site consisting of 15 acres in Fairbanks which the city had authorized for lease to Cole for 75 years.

On June 3, 1953, FHA issued a Commitment for Insurance for $2,556,300.00 in accordance with the Moorland Court application. The commitment outlined the terms for payment of the mortgage loan, and listed the various requirements that would be necessary for the sponsors, mortgagee, and mortgagor to comply with at the closing of the loan transaction and the insurance thereof by FHA. The commitment was by its terms effective for a period of 90 days from the date of its issuance unless renewed or extended by the Commissioner, and each 30 days after the original period was in fact thereafter extended until October 1, 1954.

---

1. This case was referred to us and some preparation was made by the parties prior to the Supreme Court decision in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). We therefore think it proper to file this report without reference to the Supreme Court's opinion in that case. Consequently, defendant's suggestion of lack of jurisdiction to entertain the case is rejected.

2. 28 U.S.C. § 2501 (1964 ed.)

By letter of July 27, 1953, Cole requested permission of FHA to commence construction on the project prior to initial closing of the loan. The request was made on the ground that "it is very essential to do the excavating and in-ground concrete work before the close-down of winter. Completing this work will enable us to start work two or three months earlier next spring." The letter further stated "that in the event the loan is not closed for any reason said work performed will be at a loss to ourselves." [3] A further letter signed by Cole, as President of plaintiff, dated August 3, 1953 was sent to FHA. It again requested permission to commence construction prior to closing the mortgage transaction and also stated that "All construction prior to the recordation of the insured mortgage is to be at the risk of the mortgagor." Approval for advanced construction was thereafter given by FHA on August 31, 1953, since the need for the project was urgent. The agreement as signed by Cole, stated in part: "All construction prior to the recordation of the insured mortgage is to be at the risk of the mortgagor."

In the meantime, the proposed mortgagee, Sparkman and McLean Company, decided to withdraw from the project and assigned the FHA Commitment for Insurance to the Federal National Mortgage Association (FNMA), then a federally chartered instrumentality of the United States. FNMA, therefore, became the mortgagee. FNMA agreed to loan plaintiff the $2,556,300.00 upon fulfillment of certain conditions such as execution of note and mortgage, a surety bond, title insurance, and a legal opinion concerning the validity of plaintiff corporation. FNMA did not object to the FHA authorization to commence construction prior to the FHA closing.

On September 1, 1953, at the initial meeting of directors of plaintiff, the di-

rectors authorized execution of the prior-owned Cole lease with the City of Fairbanks for the land for the project.[4] Thereafter, plaintiff entered into a contract for the construction of the project with a construction group. The contractors commenced work on the project, and in the remainder of the 1953 construction season, completed a substantial portion of the site preparation, excavation and foundation work for the apartment buildings, as well as completing a substantial portion of a commercial building which was part of the project.

At that juncture, it appeared that all that remained for completion of the project was the formal closing of the FHA commitment. However, in early November of 1953, there arose an intracorporate controversy between Cole and Rushlight over control of plaintiff. As a result of the controversy, each group held special meetings relieving the other group of any corporate authority. Thereafter, both groups executed notes and mortgages on behalf of plaintiff to FNMA. The parties, realizing that a settlement of the dispute would be necessary if the construction were to continue in the spring of 1954, attempted to settle their differences, but to no avail. As part of the settlement attempt, the Rushlight group wrote the Cole group:

One final thing about which we are deeply concerned is that reports from Washington indicate that there may be very restrictive legislation in the immediate offing on FNMA projects, and if some kind of an agreement is not made soon so that this loan can be closed we may lose the only source of financing this type of a project.

The FHA in both late January, 1954 and late February, 1954, refused to proceed with the closing until plaintiff's family feud was settled. FHA took the position that since it was not clear that there was then a legally constituted board

3. In the Fairbanks area it is as a practical matter only possible to carry on construction work of the proposed type here during the period of late spring to about the third week of November.

4. Plaintiff had become officially incorporated August 31, 1953.

of directors authorized to act for plaintiff, nor clear who were the legal officers of plaintiff, that FHA should not decide at its peril the faction to be recognized. Our trial commissioner found, and we agree, that FHA's actions were reasonable.

On April 2, 1954 a special meeting of the Rushlight group was held in an attempt to correct the corporate deficiencies that FHA objected to. It was stated at the meeting that mortgage commitments had been made "which have been extended from month to month but there is no assurance how long those extensions may be given."

As a result of the resolutions and business conducted at the meeting held by the Rushlight group, FHA concluded that Rushlight validly controlled the corporate plaintiff, and appeared ready to effectuate the closing. However, the FNMA Los Angeles Agency Counsel, Mr. Swanson, was not satisfied that the case was ready for closing. Swanson felt that FNMA was entitled to have a properly constituted mortgagor execute the note and mortgage, and as of then (April 29, 1954) there was still a difference between the two factions as to who controlled and spoke for the corporation. Swanson therefore refused to give the required legal opinion, approving the note and mortgage. Our trial commissioner found, and we again agree, that Swanson's position was reasonable.

Negotiations thereafter continued between the dissident factions within the corporate plaintiff in an attempt to resolve their differences. At the same time, FNMA Attorney Swanson attempted to iron out certain differences between the parties and the official FNMA position, so that FNMA could give its assent to the final closing.

In the meantime, on July 23, 1954, the National Housing Act, as amended, was further amended by the National Housing Act of 1954, effective August 2, 1954 (68 Stat. 590). The amending legislation imposed additional requirements upon corporate mortgagors seeking insurance under section 207, and prohibited further loans by FNMA on such housing projects as was herein involved, unless such loans were made on commitments which were outstanding prior to August 2, 1954. However, under the National Housing Act of 1954 and the rules and regulations of FHA promulgated thereunder, FHA was authorized to grant extensions and renewals of pre-August 2, 1954 commitments for insurance. The only source of financing the housing project here involved was a direct FHA insured loan from FNMA.

On September 21, 1954 FNMA wrote the FHA director in Alaska stating that the FHA commitment for insurance would expire on October 1, 1954 and that "As it will not be possible to complete the closing by that date, we shall appreciate your granting a further extension to November 1, 1954." However, by letter of September 24, 1954, the FHA director advised FNMA that no further extensions could be given until the new rules and regulations necessitated by the passage of the 1954 Act were received from Washington, D. C.

On October 1, 1954 the FHA commitment expired. The FHA Alaska director took no further action with respect thereto until the receipt by him of the agency's new rules and regulations. However, even after receipt of this data the director was unclear as to how to proceed in plaintiff's case, i. e., whether the project would have to be reprocessed entirely or not. At the same time that the FHA Alaska director was struggling with interpretation of the regulations, he felt it necessary to reinvestigate the need for plaintiff's housing in the Fairbanks area. A market analysis of the area showed no need for the housing, and FHA on February 11, 1955 determined not to extend the commitment. FNMA then cancelled the loan authorization, and plaintiff never completed the project, thereby losing all monies expended on the project, which totaled $351,368.82 including indebtedness to the contracting company.

On June 21, 1955, plaintiff commenced a civil action in the United States Dis-

trict Court for the District of Oregon against Norman P. Mason, as Commissioner of FHA, which action was assigned Civil No. 8147, in which plaintiff claimed that FHA's refusal to renew and extend its commitment constituted a breach of contract for which plaintiff was entitled to damages.

In an opinion rendered February 5, 1959 (as amended March 16, 1959), District Judge East decided that plaintiff was not entitled to recover. The court held:

> As of August 2, 1954, there was no final binding commitment between the parties to insure any mortgage loan transaction initiated by the plaintiff. The defendant's later decision that it would not again extend the original 90-day commitment for insurance and would not, in effect, insure any loan the plaintiff might acquire, was a decision entirely within the defendant agency's discretion and prerogative. The defendant did, in fact, to the Court's mind, give the plaintiff ample opportunity to arrange its affairs and close a mortgage loan transaction agreeable to the defendant.

> From a careful reading of all the evidence presented, it appears to the Court that, although no legal liability fastens on the defendant agency for the moneys expended by the plaintiff, it is evident that certain officers of the Federal Housing Administration and the Federal National Mortgage Association led the plaintiff into a false sense of security.

However, the court reserved judgment concerning an inspection fee which plaintiff had paid to FHA. Subsequently, the unused portion of the inspection fee in the amount of $12,000 was returned to plaintiff by FHA, and the district court action was dismissed with prejudice on a stipulation dated March 26, 1959.

On December 12, 1961 plaintiff brought suit in this court for the total amount expended for the unsuccessful project, plus its indebtedness resulting therefrom. As previously stated, plaintiff concedes it has no legal claim. We must therefore now examine the broader equitable facets of plaintiff's claim. We determine in that connection whether the nation owes a debt in the broad moral sense. Under the facts of this case, we do not believe such a moral debt exists, and hold that plaintiff has no equitable claim.

Recovery cannot be given even on an equitable basis for two critical reasons. First, plaintiff specifically assumed the risk of loss, and second, the original commitment never closed due to plaintiff's fault—not defendant's.

The assumption of risk barrier is self-evident. Plaintiff believed it advantageous to construct the foundation prior to the winter season, so plaintiff took the initiative and requested permission to commence construction on the project prior to closing. As an inducement and guarantee to FHA, plaintiff included with the request the statement, "that in the event the loan is not closed for any reason said work performed will be at a loss to ourselves." A later request stated, "All construction prior to the recordation of the insured mortgage is to be at the risk of the mortgagor." The actual agreement granting permission to plaintiff, as signed by FHA and plaintiff, contained the above exact words of the later request. Under the bargain, plaintiff received the right to construct early and in turn, guaranteed to absorb any losses. No evidence was presented to show that plaintiff did not realize the implication of such a guarantee, or that plaintiff did not agree to it with its eyes wide open.

Recovery would be doubtful, however, even if plaintiff had not assumed the risk of loss, since the failure to close the commitment and loan was entirely plaintiff's fault. The intracorporate controversy and struggle for power laid open the corporate nerve and made FHA chary of formally closing the agreement until the necessary mending was accomplished. Such a position was quite reasonable since at that time it was neither clear who were plaintiff's legal officers and

directors, nor who had the power to legally bind plaintiff. FHA certainly could not have been expected to decide at its peril which of the warring factions to recognize.

Further, both groups within plaintiff recognized the danger of non-reconciliation. Soon after the controversy arose the Rushlight group informed the Cole group that " * * * if some kind of an agreement is not made soon so that this loan can be closed, we may lose the only source of financing this type of a project." At an April meeting of the Rushlight group it was stated " * * there is no assurance how long those extensions [FHA commitment extensions] may be given." The warring groups, however, did not or were unable to settle their differences, even though they recognized the dangers of their continuing course of action.

By the time FHA finally concluded that the Rushlight group controlled the corporation, plaintiff ran awry of the FNMA attorney, Swanson. Swanson refused to approve the note and mortgage, taking the position that FNMA was entitled to have a properly constituted mortgagor execute the note and mortgage, and that at that time (April, 1954) there was still a controversy as to which faction controlled the corporation. This position was quite similar to the original FHA position concerning the validity of the corporate makeup, and was likewise reasonable.

The brief summary of the situation as it then existed was that both FHA and FNMA had taken reasonable positions in withholding approval of the closing until the corporate differences were resolved. Plaintiff's factions had clear

knowledge of these positions, and yet were unable to resolve their differences.

By the time the differences were resolved to the satisfaction of both FHA and FNMA, a new housing law had gone into effect. The implementation of this law further delayed the project, through no fault of plaintiff, FHA or FNMA. Finally, FHA via a market analysis decided there was no longer a need for the project, and determined in a valid exercise of administrative discretion, not to extend the agreement. FNMA then naturally cancelled the loan authorization.

Nowhere has plaintiff shown that it was treated unfairly.[5] On the contrary, plaintiff was given every opportunity by FHA and FNMA to resolve the intracorporate differences, and yet failed to do so. If plaintiff's investors had been able to settle their own differences, rather than to continually haggle and jockey for financial position, FHA and FNMA would not have been reluctant to finalize the agreements, and presumably the transactions could have been formally closed to the satisfaction of all concerned. FHA and FNMA at all times acted reasonably. Plaintiff did not.

Accordingly, on all the facts and circumstances contained in the record, and upon the findings of the commissioner which we have reviewed, and in which we concur, we conclude that plaintiff has not stated a claim, either legal or equitable, against the United States.[6]

This opinion, together with the findings of fact of Commissioner Saul Richard Gamer, which are herein adopted, will be certified to the Congress pursuant to Senate Resolution 144, 87th Congress, 1st Session.

5. There is dicta in the Oregon District Court decision that states that plaintiff was led into a false sense of security. We are unable to concur in that position.

6. Defendant has claimed a tax setoff against plaintiff, which plaintiff has agreed to in the event recovery is given. In light of our decision, however, the point has become moot.