By the Keview Panel : Upon referral of the bill (H.R. 6204, 92d Cong., 1st Sess.) “for the relief of John S. Atti-nello” to the Chief Commissioner of the Court of Claims by the House of Representatives, and the subsequent filing, of a petition by the claimant, the Chief Commissioner referred the case to Trial Commissioner Joseph V. Colaianni for the conduct of further proceedings in accordance with the Rules of the Chief Commissioner. On February 14,1972, Commissioner Colaianni reported his decision, based on facts stipulated by the parties. On February 18, 1972, the parties by joint motion requested that the Review Panel “adopt the report of Commissioner Colaianni * * * [thereby] waiving review of such report on the part of the panel.” Accordingly, the Review Panel adopts Commissioner Colaianni’s report and agrees with his conclusion that claimant “has no legal claim against the United States” but does have “an equitable claim against the United States in the sum of $100,000.” The Review Panel recommends to Congress that such claim be paid.
This determination is submitted to the Chief Commissioner for transmittal to the U.S. House of Representatives.
Opinion or the Trial Commissioner
Colaianni, Commissioner: Pursuant to 28 U.S.C. §§ 1492 and 2509, the House, on June 1, 1971, referred H.R. 6204, 92d Cong., 1st Sess., to the Chief Commissioner of the Court of Claims.
The bill involved in this referral, H.R. 6204, is entitled “A bill for the relief of John S. Attinello.” The bill proposes *1043 that the Congress enact legislation authorizing and directing the Secretary of the Treasury to pay:
* * * the sum of $100,000, in full satisfaction of all claims of the said John S. Attinello against the United States for loss of patent rights in Great Britain and Canada on a highlift supercirculation system for aircraft which was developed and patented in the United States by him (United States Patent Numbered 2,868,-480), but which was not patented in such countries as a result of the failure of the Department of Defense to forward to the appropriate American embassies applications filed with such Department by the said John S. Attinello.
The reference of H.R. 6204 to the Chief Commissioner of the Court of Claims was accomplished by means of H. Res. 401, 92d Cong., 1st Sess. The resolution indicated that the reference was made pursuant to 28 U.S.C. §§ 1492 and 2509 for “* * * further proceedings in accordance with applicable law.”
The petition of Mr. Attinello was filed with the Clerk of the Court of Claims on August 24,1971, and defendant’s answer was filed on October 21, 1971. The parties, in lieu of trial, submitted an extensive stipulation of all of the relevant facts. The stipulation of facts, along with documents referred to in the stipulation, was admitted into the record.
On the basis of facts established by the evidence in the record, as summarized in this opinion and set forth more fully in the findings of fact, I conclude that:
(1) Claimant has no legal claim against the United States, but
(2) He does have a claim, founded on equity and justice within the meaning of Burkhardt v. United States, 113 Ct. Cl. 658, 84 F. Supp. 553 (1949), and there is equitably due claimant, from the United States, the sum of $100,000.
Claimant, John S. Attinello, is an American citizen who for many years was employed by the Department of the Navy. During the early 1950’s, he was the Head of the Supersonic Section, Applied Mathematics Branch, Research Division, Bureau of Aeronautics, Department of the Navy. While so employed, he became aware of the serious landing and *1044 take-off problems that were plaguing jet-powered aircraft. The matter was of particular concern to the Navy because its jet fighters were landing at speeds which made them unsafe for aircraft carrier use.
Considerable research had been directed to conceiving a structure or system for reducing the landing and take-off speeds of supersonic fighters. By and large, the research programs of that period were directed at efforts to somehow favorably affect the flow of air over the aircraft’s wings, or, in other words, to materially affect the circulation of air about an airfoil through boundary layer control. The majority of aeronautical engineers in the early 1950’s felt that stabilizing or removal of the boundary layer would permit an aircraft to fly at lower speeds with increased lift.
Mr. Attinello felt that efforts to solve the problem by reducing or stabilizing the boundary layer would be unsuccessful. To the contrary, he felt that increased lift at reduced speeds could best be accomplished by injecting high speed air into the air already flowing over the trailing edges of the wings. By the use of Mr. Attinello’s invention, which is described and disclosed in detail in his United States Patent No. 2,868,480 and Reissue Patent No. 24,917, it was found that the boundary layer of air did not separate to the same extent as before from the wing skin at slow or near stalling speeds. By substantially reducing the separation of air flow1 over the wings at slower speeds, the lifting capacity of the wings was found to be greatly increased. In turn, this enabled jet fighters to land at lower and safer speeds.
In December 1952, Mr. Attinello disclosed his invention, entitled “High Lift Supercirculation System Using Supersonic Blowing,” to the Patent Division of the Department of the Navy. Shortly thereafter, and before a United States patent application had been prepared or filed on his invention, claimant was asked by the British Ministry of Supply to disclose his invention at a confidential conference to be held in England. With the approval of the Chief of Naval Operations, claimant did disclose his invention at the April 24, 1953, Boundary Layer Control Conference at Farnbor-ough, England. The presentation which claimant made at *1045 the conference was embodied in a classified British, record of the conference that was printed in July of 1953. The presentation was also reproduced in this country as a classified Navy document in May 1953. In November 1953, claimant and the Department of the Navy entered into an agreement which recognized that title to the invention and to any patents belonged to claimant, but at the same time claimant agreed that the United States was to have a nonexclusive, irrevocable, royalty-free license under any patents that might issue. In addition, the agreement gave defendant an irrevocable and exclusive right to transact all Patent Office business having to do with claimant’s United States application.
Since claimant was an employee of the Navy at the time he made his invention, the Government Patents Board was called upon to determine if the defendant was entitled to all rights, title and interest to the invention. The Board found, on January 11,1955, that defendant’s contribution to the making of the invention was insufficient to entitle it to an assignment of the entire right, title and interest in and to the invention. Instead, the Board concluded that title to the invention should be left with the claimant subject to a nonexclusive, irrevocable, royalty-free license being granted to defendant.
Because claimant’s invention related to classified subject matter, the patent application was filed on February 10, 1954, by the Navy as a security classified document. On April 7, 1954, a secrecy order under the provisions of 35 U.S.C. §§ 181-188 was issued by the Commissioner of Patents. As a result, claimant was ordered to keep the details of his invention secret unless he first obtained the written consent of the Commissioner of Patents to disclose the same.
In June of 1954 the Department of the. Navy disclosed the basic features of claimant’s invention in an unclassified publication, entitled Naval Aviation News. In addition, public disclosure of claimant’s invention, in the form of detailed magazine articles, also occurred in England on November 12, 1954, and December 3, 1954. All of the public disclosures were made without authority or approval of claimant.
*1046 While claimant willingly granted defendant a nonexclusive, irrevocable, royalty-free license for Government use of his invention, he intended to retain all rights to commercial use of his invention in the United States. Also, the license granted to defendant has been interpreted in the past so as not to give the United States authority to license foreign governments to produce or utilize an invention abroad, except where the equipment is manufactured in the United States pursuant to defendant’s license. Indeed, claimant was interested in protecting his rights to foreign patents. He was particularly interested in obtaining British and Canadian patents to prevent commercial or governmental use of his invention in either of those countries without just compensation.
Therefore, on June 30, 1954, on the basis of his prior disclosure at the April 24, 1953, confidential conference at Farnborough, England, and the classified documents based thereon, claimant requested the Navy to petition the Patent Office for modification of its secrecy order. At that time he only sought permission to file a British patent application which would correspond to his then-pending United States application. The request was not made by the Navy Department. Accordingly, in January 1955, claimant again requested that Navy patent counsel petition the Patent Office to file a patent application in Great Britain. By this time, of course, the details of Mr. Attinello’s invention had been publicly disclosed in both this country and in England. The Department of the Navy did petition the United States Patent Office on January 21,1955, for a modification of its outstanding secrecy order. Permission to file in Great Britain was mailed to the Office of Naval Eesearch on February 2, 1955.
Relevant English law prevents an applicant from filing for a patent after the details of his invention have been publicly disclosed. However, since both the United States and England are members of the International Patent Convention, Mr. Attinello could, notwithstanding any public disclosure which occurred after the filing date of his United States application, file for a British patent if such applica *1047 tion were made within one year of the 'filing date of his United States application. In essence, Mr. Attinello’s British patent application would be given the benefit of his earlier United States filing date to thus avoid the debarring effects of the publications which occurred in June 1954 in this country and in November and December of 1954 in England.
■In addition, the parties are in agreement that there is no judicial precedent to indicate that Mr. Attinello’s confidential disclosure in Great Britain in April of 1958 would have acted as a bar to the granting of a British patent on his invention.
It, accordingly, was imperative that Mr. Attinello file his British application before February 10, 1955. However, because of the delay by the Navy in petitioning the Patent Office for modification of its outstanding secrecy order, it was impossible for Mr. Attinello to file a British application within the time demanded by the provisions of the International Patent Convention.
Since the Department of the Navy knew that the classified material incorporated in claimant’s invention had been disclosed to British authorities at the confidential conference in 1953, and since the Navy itself published an unclassified description of the basic invention in June 1954, the long delay by the Navy in petitioning the Patent Office for modifications to the secrecy order with respect to Great Britain is found to be unjustified and inexcusable. The failure of the Department of the Navy to expedite claimant’s June 1954 request for modification of the secrecy order did prejudice Mr. Attinello’s right to obtain a British patent.
Claimant’s only recognition for his technologically significant invention, which defendant admits to using bo the present day on substantially all supersonic fighters, was a citation for Meritorious Civilian Service and a limited in-grade raise in salary.
Because of the significant contribution which claimant’s invention has made to aircraft technology, defendant has indicated that it does not object to legislation which would acknowledge this contribution by providing equitable compensation for the loss of claimant’s British patent rights. *1048 The damage to claimant caused by failure to obtain a British patent is directly related to the number of aircraft produced in England, which, when flown, would constitute a Crown use of his patent.
The parties have stipulated that the British Government has utilized claimant’s invention on some 261 supersonic aircraft. Accordingly, since it costs approximately $20,000 to install claimant’s system on each aircraft, and since a similarly situated' patentee would be entitled to a royalty of between 2 and 3 percent of the total-dollar procurement, claimant’s recovery, had he obtained a British patent, would be in the order of $104,400 to $156,600. By way of compromise, the parties are in agreement that claimant is equitably entitled to $100,000 as compensation for the' loss of any British patent.
I, accordingly, conclude that claimant has no legal Claim against the United States, but that under the standards of Burkhardt v. United States, supra, claimant does have an equitable claim against the United States in the amount of $100,000.
FINDINGS 03? Fact
1. (a) Pursuant to H. Res. 401, 92d Cong., 1st Sess., H.R. 6204 was referred to the Chief Commissioner of the United States Court of Claims.
(b) The text of H. Res. 401 reads as follows:
_ Resolved, That H.R. 6204 entitled “A bill for the relief of John S. Attinello”, together with all accompanying papers, is hereby ref eired to the Chief Commissioner of the Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code, for further proceedings in accordance with applicable law.
2. (a) H.R. 6204,92d Cong., 1st Sess., is entitled “A BILL for the relief of John S. Attinello.”
(b) The text of H.R. 6204 reads as follows:
Beit enacted by the Senate and House of Representar Uves of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to John S. Atti-nello of Alexandria, Virginia, the sum of $100,000, in full *1049 satisfaction of all claims of the said John S. Attinello against the United States for loss of patent rights in Great Britain and Canada on a highlift supercirculation system for aircraft which was developed and patented in the United States by him (United States Patent Numbered 2,868,480), but which was not patented in such countries as a result of the failure of the Department of Defense to forward to the appropriate American embassies applications filed with such Department by the said John S. Attinello.
SEC. 2. No part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this section shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
3. (a) As a result of its consideration of H. Bes. 401, House Beport No. 92-172,92d Cong., 1st Sess., was prepared by the Committee on the Judiciary.
(b) The report indicates that the subject matter of the bill (H.B. 6204) had been previously considered at a July 31, 1969, hearing by a subcommittee of the full Committee on the Judiciary, pursuant to a bill pending before the 91'st Congress. In addition, reports were submitted on the bill being considered by the 91st Congress by the Department of the Navy on August 8,1969, and by the Department of Commerce on July 31,1969.
(c) The report also indicates that certain patent aspects of the case were felt to be of sufficient importance to both the Government and its employees that a full investigation was warranted. The Committee felt that only after a full investigation had been made could the claim be evaluated “* * * to determine whether it is a proper subject for legislative relief.”
4. (a) In accordance with the Buies of the Chief Commissioner, claimant’s petition was filed on August 24, 1971. Defendant’s answer was filed on October 21,1971.
(b) The parties, on December 28, 1971, submitted a stipulation of facts, along with supporting Joint Exhibits 1 *1050 through. 19, inclusive. The stipulation and exhibits were intended by the parties to embody all of the records and material essential to a determination of the facts. Proof was, therefore, closed on December 28,1971.
(c) The stipulation provided that the parties did not desire to submit requested findings of fact or briefs as permitted by Rules 184(d) and (e) of the court.
(d) The findings of fact which follow are based primarily upon the stipulation of the parties, as supplemented by Joint Exhibits 1-19, inclusive, and, as well, by the July 31, 1969, hearings by the subcommittee of the full Committee on the Judiciary and the reports of the Departments of the Navy and Commerce.
5. (a) John S. Attinello is a citizen of the United States, residing in Alexandria, Virginia.
(b) In 1952, Mr. Attinello was employed by the Department of the Navy as the Head of the Supersonic Section, Applied Mathematics Branch, Research Division, Bureau of Aeronautics.
6. (a) With the advent of jet power in the late 19,40’s or early 1950’s, pilots found it necessary to take off and land their planes at speeds significantly higher than had been the case with propeller-driven aircraft. Runways at existing airports and on aircraft carriers were found to be too short to safely accommodate the high landing speed of jet aircraft. The problem was particularly acute for the Navy since aircraft carriers provided a minimum of runway space for both the take-off and landing of supersonic planes. By and large, the aerodynamicists of the early 1950’s were in substantial agreement that the design of supersonic aircraft had to be modified to achieve higher lift at lower speeds. However, the means for achieving high lift at lower speeds eluded their best efforts.
(b) The majority of aeronautical engineers in the early 1950’s apparently felt that stabilizing or removal of the circulation of air about the airfoils of an aircraft would enable the aircraft to generate greater lift at lower speeds. Therefore, the research programs of that period were broadly concentrated on the following categories: (i) boundary *1051 layer control devices which, relied either on suction or low-speed blowing, and/or (ii) wing camber and wing area increasing means. Mr. Attinello did not agree. To the contrary, he felt that increased lift at reduced speeds could best be accomplished by injecting high-speed air into the air already flowing over the trailing edges of the wings. Claimant’s concept proved to be correct for it was found that as a result of using his system, the separation of the air or boundary layer, flowing over the wings as the aircraft approached stall or near stalling speeds, was substantially reduced. It was also found that, by the use of Mr. Attinello’s concept, an aircraft could land at significantly lower speeds, since the lifting capacity of the wings was greatly increased. Claimant’s invention, as described and disclosed in United States Letters Patent No. 2,868,480 and Reissue Patent No. 24,917, has been used continuously to date on substantially all American supersonic fighters.
(c) In December 1952, Mr. Attinello disclosed his invention to the patent division of the Department of the Navy. The invention, entitled “High Lift Supercirculation System Using Supersonic Blowing,” ultimately proved to supply the long-sought-after solution that enables supersonic jets to take off and land at moderate speeds.
7. (a) After Mr. Attinello disclosed his invention to the Navy Department, but before a patent application had been prepared for filing with the United States Patent Office, a request was made by the British Ministry of Supply that he disclose his invention at a confidential conference which was to be held in England on April 24,1953. As a result of the British Ministry of Supply’s request, and with the approval of the Chief of Naval Operations, Mr. Attinello did disclose his invention at the April 24,1953, Boundary Layer Control Conference at Farnborough, England. The confidential conference was attended by 132 British subjects who represented, in addition to various British governmental agencies, 18 aircraft firms, four engine firms, five universities, and two airway corporations.
(b) The discussions and presentations at the conference are embodied in the July 1953 Royal Aircraft Establish *1052 ment, Technical Memo No. Aero. 367, “Record of the Symposium Held at R.A.E. on Friday, 24th April 1953, on Boundary Layer Control By Suction.” The record of the conference was classified “Confidential-Discreet” under the British Official Secrets Act.
■(c) Included among the papers contained in the record of the symposium is the speech presented by Mr. Attinello, entitled “Suction and Blowing at a Flap Gap.” The paper disclosed the details of Mr. Attinello’s invention.
(d) In May of 1953 the technical paper delivered by Mr. Attinello at the Boundary Layer Control Conference in Famborough, England, was duplicated as a Bureau of Aeronautics, Research Division, report and issued as classified navaek Report No. DRr-1533, entitled “Augmenting Lift by Means of a Supersonic Jet Directed Over Flaps.”
8. (a) The Department of the Navy in due course prepared a patent application based on Mr. Attinello’s December 1952 invention disclosure. However, prior to the filing of the application with the Patent Office, Mr. Attinello and the Department of the Navy, on November 19,1953, entered into a license and agreement.
(b) The agreement acknowledges that Mr. Attinello had concurrently executed an oath, power of attorney and petition for a patent application, entitled “High Lift Super-circulation System Using Supersonic Blowing.” The agreement granted the United States a nonexclusive, irrevocable, royalty-free license to Mr. Attinello’s invention and under any patent that issued thereon. In addition, the 'agreement provided that Navy Department attorneys would have full charge over prosecution of Mr. Attinello’s application through the Patent Office.
(c) Mr. Attinello’s application was filed with the United States Patent Office on February 10,1954. Because the application covered classified subject matter, the patent application was filed by the Department of the Navy as a security classified document.
(d) Subsequently, and particularly on April 7, 1954, a secrecy order under the provisions of 35 U.S.O. §§ 181-188, was issued by the Patent Office.
*1053 (e) The secrecy order provided, in. pertinent part:
You are hereby notified that your application * * * has been found to contain subject matter, the unauthorized disclosure of which might be detrimental to the national security, and you are ordered in nowise to publish or disclose the invention or any material information with respect thereto, including hitherto unpublished details of the subject matter or said application, in any way to any person not cognizant of the invention prior to the date of the order, including any employee of the principals, but to keep the same secret except by written consent first obtained of the Commissioner of Patents, under the penalties of 35 TJ.'S.C. (1952) 182, 186.
9. (a) On the theory that the subject matter of'his patent had already been disclosed at the April 24,1953, confidential conference at Famborough, England, claimant, on June 30, 1954, requested the Navy Department to petition the Patent Office for modification of its secrecy order to permit him to file a patent application, which would correspond to his pending United States application, in Great Britain. In further support of his request, Mr. Attinello called attention to the confidential Navaer report of May 1953 which also described his invention.
(b) At approximately the same time, but unknown to Mr. Attinello at the time of his request, the June 1954 issue of Naval Aviation News, an unclassified publication, disclosed the basic features of Mr. Attinello’s invention in an article entitled “Boundary Layer Control.”
(c) In addition, public disclosure of Mr. Attinello’s invention was also made by the following unclassified British publications:
(i) Flight, November 12,1954, and
(ii) The Aeroplane, December 3,1954.
10. (a) In January of 1955, almost seven months after his original June 30,1954, request, Mr. Attinello again asked Navy patent counsel to petition the Patent Office for permission to file in Great Britain a patent application corresponding to his pending United States application. In response to this second request, patent counsel for the Department of the Navy did petition the United States Patent *1054 Office on January 21, 1955, for such, permission. On February 2,1955, the United States Patent Office mailed a permit to the Office of Naval Research.
(b) The procedure usually followed by the Department of the Navy in handling mail from the Patent Office called for the Patent Records Branch, which received such mail, to send it to the “field patent branch” that was prosecuting the patent application. The mail could be sent to the “field branch” by way of appropriate Bureau Patent Counsel, or the mail could be sent directly to the “field patent branch” with an information copy being forwarded to the appropriate Bureau Patent Counsel. The applicant-inventor would then be notified of the Patent Office’s action by either the “field patent branch” or, in some instances, by the Bureau Patent Counsel. In any case-, claimant did not receive notice of the Patent Office’s modification of its secrecy order until some days after February 2,1955.
11. (a) Under British law, broadly speaking, an application for a patent cannot be validly filed after public disclosure of the inventive subject matter in Great Britain.
(b) The' question of whether Mr. Attinello’s invention had been publicly disclosed in England was of prime importance in this case, since it was known that he had disclosed the details of his invention to British authorities in April of 1958, and, as well, since the Naval Aviation News carried an unclassified description of the basic invention in June of 1954.
(c): However, the provisions of the International Patent Convention, to which both Great Britain and the United States are parties, permit the filing of a patent application in Great Britain even after a public disclosure in England has occurred, if a British application is filed within 12 months from the date of a previously filed foreign application. Accordingly, in this instance, Mr. Attinello would not have to concern himself with the public disclosure of his invention if he filed a British application for a patent, corresponding to his United States application, within one year of his United States application. In addition, the effect of claimant’s confidential disclosure in 1953 on his right to obtain a British' patent is not dear. The Navy’s investigation *1055 of this matter apparently was far from conclusive. In the words of the stipulation:
* * * the situation was unusual and, having no judicial precedent which directly applied, British patent experts consulted by the Navy declined to give an opinion concerning the legal affect [sic] of the 1053 confidential disclosure.
It was, therefore, imperative that Mr. Attinello’s United Kingdom application be filed in Great Britain on or before February 10,1955.
(d) Thus, under these circumstances, the delay by the Navy until January of 1955 to petition the Patent Office for modification of its secrecy order bo permit Mr. Attinello to file an application in Great Britain is found to be unduly long.
(e) Even under the best of conditions, Mr. Attinello could not have filed a United States patent application in the few days which remained between the time he received, notice of the Patent Office’s February 2,1955, permit for filing and the February 10, 1955, one-year anniversary date of his United States patent application. Moreover, further aggravating the plight of Mr. Attinello, was the requirement in the Patent Office’s February 2,1955, permit that:
* * * the papers for the foreign applicaltion[s] and its [their] prosecution shall be transmitted in a manner approved for information classified as above to the Initiating Agency [Bureau of Aeronautics, Department of the Navy] for forwarding * * *.
12. Mr. Attinello apparently encountered additional difficulties in determining the appropriate Department of the Navy security channels for filing his patent application in Britain. It was not until August 9, 1955, that he submitted papers, as required by the Patent Office’s February 2,1955, permit, for filing a British application to offices within the Bureau of Aeronautics for transmittal to Great Britain. The files of the Navy Patent Organization indicate that the papers were not forwarded to England for processing, but no explanation or reason is given for this failure.
13. (a) Inasmuch as Mr. Attinello had not filed a United *1056 Kingdom patent application in Great Britain by February 10, 1955, the first anniversary date of his United States filing, he was correctly informed by his British patent agent that he was barred from obtaining corresponding valid British and Canadian patents. Particularly, Mr. Attinello was advised by his British patent agent that the unclassified publications occurring after his February 10, 1954, United States application, but 'before February 10, 1955, would bar his present attempts to patent his invention in Great Britain and Canada.
(b) Since Mr. Attinello was debarred from obtaining a British patent after February 10, 1955, the failure of the Navy to transmit the papers which he filed with the Bureau of Aeronautics on August 9, 1955, to Great Britain is of no legal consequence.
14. Mr. Attinello’s right to obtain a patent in Great Britain was prejudiced by the failure of the Department of the Navy to expedite and process his original June 30,1954, request for Patent Office permission to file an application, corresponding to his United States filed application, in Britain. Particularly, since Mr. Attinello’s April 1953 confidential disclosure in England was done with the knowledge and approval of the Chief of Naval Operations, and, also, since Mr. Attinello’s invention was disclosed in an unclassified Navy publication, his June 30, 1954, request that the Navy petition the Patent Office for modification of its secrecy order was reasonable and should.have been promptly expedited by the Navy Patent Organization.
15. On June 29, 1955, Mr. Attinello requested that the Navy Patent Organization petition the Patent Office for modification of its April 1954 secrecy order and permit the filing of a corresponding application in Canada. The petition to the Patent Office was made on September 9, 1955, and the permit was allowed and mailed by the Patent Office on September 22, 1955. However, since both Mr. Attinello’s request and the Patent Office’s permission were some months after the first anniversary filing date of his United States application, he was barred, ¡because of the prior public disclosure of his invention, from obtaining a Canadian patent.
*1057 16. (a) The right of Mr. Attinello to retain the full title to his invention was established by the Government Patents Board on January 11,1955.
(b) The Government Patents Board was apparently supplied with a report which outlined the factual setting in which Mr. Attinello’s invention was made. Based on the information presented, Mr. Archie M. Palmer, Chairman of the Government Patents Board, concluded:
Upon the basis of the information submitted on this case, it appears that the contribution of the Government to the mating of the invention is insufficient equitably to entitle the Government to assignment of the entire right, title and interest in and to the invention.
Therefore, pursuant to paragraph 1 of Executive Order 10096, the Chairman of the Government Patents Board concurs in the determination of the Department of the Navy that title to the invention be left in the inventor, subject to the license granted to the Government by the inventor.
17. (a) Mr. Attinello’s original and reissue patents state that:
The invention described herein may be manufactured and used by or for the Government of the United States of America for governmental purposes without the payment of any royalties thereon or therefor.
(b) Mr. Attinello’s invention is primarily directed to aircraft operating at supersonic speeds. Thus, it has not, to date, been used commercially in the United States. Indeed, the only use in the United States for Mr. Attinello’s invention has been on military aircraft operating at supersonic speeds.
(e) For his invention, Mr. Attinello was presented the Meritorious Civilian Service Award by the Department of the Navy. The citation acknowledged and recognized that:
Mr. Attinello’s contribution towards solving this acute problem is considered an especially significant technological advancement in naval aviation.
(d) Aside from a small imgrade raise in his Government salary for some 14 months, Mr. Attinello received no monetary award from the Government for his invention.
(e) Mr. Attinello’s license to the United States was lim *1058 ited to his United States patent application. Under the agreement, Mr. Attinello retained the rights to obtain foreign patents to protect his invention from use by foreign countries or foreign business establishments for aircraft made and/or used outside of the United States. It was in furtherance of these rights that Mr. Attinello timely moved for permission to file a corresponding patent application in Great Britain.
18. (a) On July 15, 1966, having left the employ of the Government, Mr. Attinello presented a claim to the Navy for compensation. Mr. Attinello’s claim was directed to aircraft, which incorporated his invention, that were built in this country for use by the British and other allied countries.
(b) Mr. Attinello’s claim was denied by the Department of the Navy on September 29,1966, for the reason that procurement in the United States under Navy contracts was covered by his grant of the license to the Government, regardless of the ultimate disposition of the procured aircraft. The Navy also based its denial on the grounds that Mr. Atti-nello was a Government employee at the time his invention was made and that his duties were such that 22 U.S.C. § 2356 or 28 U.S.C. § 1498 precluded his bringing a suit against the United States.
19. However, Mr. Attinello’s license to the United States does not authorize or permit foreign governments to produce or utilize his invention abroad, unless the invention was manufactured in the United States pursuant to said license. Therefore, the damages to Mr. Attinello, had he not been prevented from filing for a United Kingdom patent, and had he thereafter been successful in obtaining a corresponding British patent, would be directly proportional to the number of aircraft produced in Great Britain for the Crown.
20. Since the claimant’s invention was a significant contribution to aircraft technology, defendant does not object to legislation which would acknowledge Mr. Attinello’s contribution by providing equitable compensation to him for the loss of his British patent rights.
*1059 21. The parties have stipulated that:
(a) Jane's, All the World's Aircraft, is an authoritative reference sourcebook;
(b) Jane's, for 1960-1961, states that the British Government had obtained Scimitar aircraft employing supersonic blowing over the upper surfaces of the flaps;
(c) Jam's, for 1970-1971, states that the British Government had obtained Buccaneer aircraft employing “supercir-culation” boundary layer control with air outlet slots forward of the flaps; and
(d)' The British Research and Development Staff of the British Defense Staff, Washington, D.C., was requested by the Department of the Navy to verify the number of military planes of British manufacture which utilized the invention. Mr. F. R. Robinson, then Assistant Director of Patents, replied that the invention had been used in 75 Scimitars and 186 Buccaneers.
22. The cost of installing a system to permit the use of claimant’s invention is approximately $20,000 per aircraft. Further, the parties agree that a similarly situated patentee could expect to receive for the use of his invention a royalty of between 2 and 3 percent of the total-dollar procurement, or between $104,400 and $156,600 (2 or 3 percent of $5,220,000 ($20,000 X 261)). Accordingly, the parties are in agreement that:
It would thus appear that compensation in the amount of $100,000, as provided in H.R. 6204 entitled “A bill for the Relief of John S. Attinello”, would be equitable.
CONCLUSION
1. Claimant has no legal claim against the United States.
2. Under the standards of Burkhardt v. United States, supra, claimant does have an equitable claim against the United States in the sum of $100,000.